COOK–REYNOLDS CO., Respondent, *v.* BEYER, Trustee, Appellant.

(No. 7,778.)

(Submitted April 23, 1938. Decided May 23, 1938.)

[79 Pac. (2d) 658.]

(1)

*Mr. Merle C. Groene,* for Appellant, submitted a brief, and argued the cause orally.

*Mr. C. E. Baker,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an action instituted on certain written commission agreements with relation to the sale of real estate and to reform the same and enforce payment thereon as reformed.

The plaintiff, respondent, is the Cook-Reynolds Company, a corporation, and the defendant, appellant, is O. F. Beyer, as trustee for the Bankers Loan & Mortgage Company, a corporation, the Commercial National Bank of Fond du Lac, Wisconsin, a banking corporation, and Hattie B. Giddings, deceased, and

4

Beyer as trustee for the estates of Hattie B. Giddings and H. R. Potter, has appealed from the judgment on two of the three causes of action contained in the complaint. On the third cause of action the court found for defendant. That cause of action claims no further interest here.

In 1925 the Bankers Loan & Mortgage Company was the owner of what was known as the Hamilton Ranch in Fergus county. The ranch was divided into several tracts for sale, and plaintiff was engaged as a real estate broker to sell the tracts and receive commissions therefor. One tract was sold to parties named Smart, and another tract to one Wesley Butler. The mortgage company and the purchasers, acting through plaintiff, entered into contracts for the sale of the lands on a time payment plan. The selling price of the Smart tract was $4,812.60; of this amount the mortgage company was to receive $3,240 net, and the plaintiff was to receive $1,572.60 as its commission. The selling price of the Butler tract was $5,200; of this amount the mortgage company was to receive $4,360 net, and the plaintiff was to receive $840.

At some period of the negotiations the mortgage company assigned and transferred all of the lands to H. R. Potter, as trustee for the Commercial National Bank, Hattie B. Giddings and Potter himself. Potter, as trustee, thereupon assumed and agreed to discharge the obligations of the mortgage company to pay commissions to plaintiff. Potter died in 1931 and Beyer succeeded to the trusteeship.

In February, 1926, written commission agreements were drawn by some officer of plaintiff corporation and forwarded to Potter, who examined the contracts and sent them forward through one Sexmith, who was connected with the mortgage company. The contracts were duly executed and went into effect. The Smart and Butler contracts were identical in all except names and amounts. It appears that previous to the execution of these commission agreements or contracts, the parties were proceeding under an agreement by which plaintiff was to receive 25% of payments made as a commission. In the new contract a different schedule was adopted. This schedule

provided that the commission to go to the plaintiff was to be as follows: 10% of the amount paid in 1926; 15% in 1927; 20% in 1928; and 25% thereafter until plaintiff had received the full amount of the commissions,—in the Smart case $1,572.60, with interest from October 1st, 1925, at 6%. The Smart contract then contained the following proviso: "It being understood that when said L. E. Smart, R. T. Smart and M. E. Smart have paid to the party of the first part all of the purchase price named in the said Contract for Deed, with the exception of an amount equal to two-thirds of the said net price of $3,240.00 to be received by the party of the first part for said land, that then the party of the second part shall be entitled to receive all of the succeeding payments made by (the Smarts) until it has received such commission or profit with interest thereon in full."

Plaintiff, being in the real estate business in Lewistown, took care of the financial details connected with these contracts from 1925 to 1935. It served somewhat in the nature of intermediary between the contract purchasers and sellers. It collected payments on the purchase price, deducted its commissions and remitted the balances to Beyer, who had succeeded Potter as trustee. It secured extensions of payments from time to time and served both parties in innumerable ways, as is evidenced by the long series of correspondence set forth as exhibits in the record, all to the end that the contracts might be performed and the sellers and itself, as real estate agent, compensated.

In May, 1935, attorneys for Beyer, the trustee, notified plaintiff that its services were discontinued, and that it should not collect anything further on the contracts.

On November 8, 1935, this action was instituted in the district court of Fergus county. The first cause of action, based on the Smart commission contract, alleged the sale of the property to the Smarts for $4,813.60 [$4,812.60?]; that the commission was $1,572.60; that certain payments of principal and interest were made thereon; and that there was a balance due of $1,422.83, with accrued interest.

The second cause of action, based on the Butler contract, alleged the fact of the sale to Butler for $5,200; the agreement to pay the commission of $840; the payment of certain amounts of principal and interest on the contract; and that there was a balance of $693.19 due thereon, with accrued interest. The Smart and Butler commission agreements were attached to the complaint as exhibits.

Beyer, as trustee for the estates of Potter and Giddings, in due time filed an answer denying that anything was due on the contracts.

The cause came to trial before the court without a jury. The first witness called was C. L. Cook, the secretary of the plaintiff corporation. When he proceeded to testify, objections were made on various and sundry grounds, and it soon became evident that plaintiff could not stand upon the contracts as written. Thereupon plaintiff asked permission of the court to amend its causes of action by pleading that a mutual mistake had been made in the preparation of the commission agreements. The amendment consisted of striking from the Smart contract the provision reading: "It being understood that when said Smarts have paid to the party of the first part all of the purchase price named in the contract and deed with the exception of an amount equal to two-thirds of the said net price of $3,240.00 to be received by the said party of the first part for said land, that then the party of the second part shall be entitled to receive all of the succeeding payments made by (the Smarts) until it has received such commission or profit with interest thereon in full." and inserting in lieu thereof the following: "It being understood that when the said party of the first part shall have received from the said (Smarts) ⅓ of the sum of $3,240.00 being the net amount under this contract to be received by the first party under said agreement, that then the party of the second part shall be entitled to receive all of the succeeding payments made by the said (Smarts) until it has received its commission with interest thereon in full." To like effect, except in name and amounts, was the amendment offered with relation to the Butler agreement.

The proposed amendment alleged that in the course of drafting the agreements a mutual mistake had been made, and that the part to be stricken had been erroneously included in the contract instead of the language sought to be substituted. Defendants objected to the amendment, and the court took the matter under consideration, but finally granted the motion to amend and adjourned the trial of the cause to a future date.

The answer, as it appears in the record, was apparently prepared after this amendment. It denies the material allegations of the complaint and its several causes of action; denies that there was any mutual mistake or that the contract as drafted did not state the actual contract agreed upon by the parties. In addition, the answer pleaded that the causes of action were barred by section 9029 and subdivision 4 of section 9033 of the Revised Codes and that no mistakes were made, but that if any mistakes were made in the drafting or execution of the commission agreements, the mistakes were made on the 6th day of February, 1926; that plaintiff knew, or in the exercise of reasonable skill and diligence should have known, of such mistake or mistakes, but that, notwithstanding such claim of mistake, plaintiff had during all of the period of time from February 6, 1926, until shortly prior to the institution of the action collected all sums of money from the parties mentioned in the commission agreements and remitted the same to defendant or his predecessor in interest on the basis of the terms and conditions of the commission agreements as written, and that plaintiff had waived the right to alter or change the agreements, and that it was estopped to claim any mistake therein. In other words, defendant pleaded both statutes of limitation and estoppel.

On a subsequent date the trial was resumed and was finally concluded and the cause submitted to the court for decision. The court made findings of fact and conclusions of law which, in substance, were to the effect that all of the allegations of plaintiff's complaint, including the allegations of mutual mistake, were substantiated; that a mutual mistake had been made in the execution of the contracts, and that plaintiff was entitled

to the relief asked for in the first two causes of action. Judgment was entered accordingly, and this appeal is from that judgment.

Appellant has made several specifications of error. They go (1) to the amendment of the complaint in the course of the trial; (2) the introduction of testimony; (3) the sufficiency of the evidence to support the findings and judgment, and (4) that the judgment is contrary to law and is not supported by the evidence.

The record discloses that the trial of the cause was characterized by numerous objections, arguments and adjournments. The effort to amend the complaint by including the allegation for reformation of the contracts on account of mutual mistake precipitated much argument and finally an adjournment. It must be evident that an entirely new element was introduced into the case by the amendment. The suit was begun and the trial started upon the contracts as written. The amendment tendered the equitable issue of reformation.

In this particular we call attention to the fact that this court, in common with courts generally, adheres to the rule that in order that a written contract may be reformed for the reason given, several things must be made to appear, as follows: That a contract was entered into; that the contract executed was not the one agreed upon; that the variance occurred by mistake and in what the mistake consisted, and that the mistake was mutual. (*Thielbar Realties, Inc.*, v. *National Union Fire Ins. Co.*, 91 Mont. 525, 9 Pac. (2d) 469.)

Before entering upon a discussion of the evidence, we do not hesitate to say that the real issue in the case was the right to make the amendment. We may assume, for the purposes of this case, that the amendment was properly made, but still, when the evidence supporting the right to a reformation is considered, it must be borne in mind that the commission agreement contracts had been in existence for a period of ten years; that they had been acted upon as written during all of that time; that even when the suit was started no attempt was made to show that a mistake had been made and that the defendants

pleaded all available defenses, including denials and special defenses, setting up the statute of limitations and the principle of estoppel. All of these defenses really merge in this case into one objective, which is the general resistance to recovery.

The defense of estoppel involves well-known principles of ■ law. In 23 Ruling Case Law, page 347, section 43, the question of estoppel by ratification is stated as follows: "If a party acquiesces in an instrument after becoming aware of the mistake, he loses his right to reformation. The acquiescence may be direct or implied. If for instance a deed, through mistake, conveys too much land, the vendor cannot have it corrected if, after the discovery of the mistake, he receives the purchase money and yields possession to the vendee. The acquiescence in the written instrument may be implied from an unreasonable delay in applying for redress after getting notice of the mistake. Of course there can be no acquiescence unless the party knows of the error in the instrument or the circumstances are such that he will be presumed to know of it." The principles enunciated in this section must be borne in mind when considering the case as a whole.. (See, also, secs. 8745 and 7497, Rev. Codes.)

We enter upon a review of the evidence in the light of the ■■ familiar rule that the findings of the trial court will not ordinarily be disturbed when there is substantial evidence in the record to support them, and in conformity with the further rule that where the facts and surrounding circumstances of a case do not conform to the sworn testimony of the witnesses, the evidentiary value of the latter loses weight. (Compare *Casey* v. *Northern Pac. Ry. Co.,* 60 Mont. 56, 68, 198 Pac. 141; and see Jones on Evidence, 2d ed., sec. 1525, p. 2784, and *Humble* v. *St. John,* 72 Mont. 519, 522, 234 Pac. 475.)

The essential facts of this case may be stated as follows: ■ Written commission agreements were entered into between plaintiff and defendant's predecessor in interest, defendant subsequently assuming the obligation of his predecessor under the agreements as written. The terms of the agreements in controversy, hereinbefore set out, are clear, concise and unambiguous, and are capable of but one interpretation. Plaintiff's

10

quarrel is not exactly that they are ambiguous, but rather that, as written, they fail to recite the true intentions of the parties. It is its contention that in drafting the agreements a mutual mistake was made whereby the true terms agreed upon were not set forth.

Plaintiff's witnesses Lamar Sexmith, Montana agent with respect to the lands here involved, and C. L. Cook, secretary of the plaintiff real estate company, testified as to different commission agreements from those originally drafted and sued upon. Their testimony is substantially to the effect that shortly after the Smart and Butler contracts were entered into, they got together at Hobson, Montana, Sexmith's headquarters, with Mr. Reynolds, president of the plaintiff company. They testified that an arrangement for commissions was there agreed upon which was considerably different in operation and effect from those finally drafted by Mr. Reynolds some months later. Mr. Sexmith apparently had the authority from the owners of the land to make such arrangements with plaintiff company with regard to commissions as he saw fit.

In the course of the trial a letter written by Sexmith to Potter, defendant's predecessor in interest, was introduced in evidence, in which Sexmith explained the fact that plaintiff company wanted a different arrangement with regard to the commissions it was getting. At that time there apparently was another arrangement in effect with which we are not concerned in this controversy. The letter clearly pointed out that the new arrangement was to be certain percentage payments to plaintiff company up until such time as one-third of the net price was paid in by the contract purchasers, the net price being a price the owners of the land had agreed to take for the land. Thereafter, according to the letter, all payments were to be applied on the commissions of the plaintiff until it was paid in full—an agreed amount equal to the difference between the purchase price to be paid by the contract purchasers and the net price to the owners of the land. They testified that, if the written commission agreements recited any terms different from those outlined in the letter written by Sexmith, then there had been

a mistake in the drafting thereof which failed to express the intention of the parties.

The written agreements were signed on behalf of plaintiff by Reynolds, president, and Ottman, then secretary. They were submitted to Sexmith before they were signed, and he testified that at that time he failed to notice that they were not in compliance with the terms of his letter and the prior oral negotiations which led up to the writing of that letter.

Throughout the trial witness Cook stood steadfast to his conviction that the written agreements did state the true intentions of the parties, but in the same breath stated that if they imposed terms different from those contained in the Sexmith letter, they did not represent the true agreement. He said the terms might have been construed differently, but that, in his opinion, they did represent the true agreement.

Defendant introduced a great number of letters in evidence consisting chiefly of communications between the plaintiff and defendant or his predecessor. All were signed in behalf of the plaintiff company by either secretary Cook or president Reynolds. This correspondence covered a period of time of nearly ten years,—1926 to 1934. For the main part these letters were written with reference to some phase of the land contracts of either the Smarts or Butler. Many of them evidenced the fact that a remittance was being enclosed to apply as payment on one or the other of the land contracts, less, each time, the commission percentage owing to plaintiff under the written commission agreement. An obvious characteristic of these letters is the significant fact that the author, whether president Reynolds or secretary Cook, was meticulously careful each time in mentioning the remittance and acknowledging the retention of the commission percentage, to call attention to that portion of the written agreement authorizing the particular application of the payments made by the purchasers. In some of the letters the officers took special care to quote verbatim from the commission agreement with reference to the part under which they were proceeding. In many of them it was not unusual for them to conclude with the following or similar words: "We also ask

that you write to us, stating that the foregoing application on our commission agreements is in accordance with our understanding.''

These letters become important in arriving at the intention of the parties, and particularly of plaintiff, in showing just what actual interpretation was being placed on the agreements as a matter of business practice. Possibly plaintiff intentionally followed the letter of the written agreements, or possibly it did so through some mistake on its part. Whatever the case might have been, this harmonious and uniform course of conduct over this long period of time certainly established a mutual construction of the contracts and the business relations and the practice between the two parties. (*Marias River Syndicate* v. *Big West Oil Co.*, 98 Mont. 254, 38 Pac. (2d) 599, and cases therein cited.) That this practice conformed to the letter of the commission agreements as written is persuasive reason why the parties should be bound by those agreements. Such conduct, if intentional or under circumstances which imputed knowledge, constituted a ratification of the agreements as they actually were, and not as plaintiff now contends it thought they were. (See *Van Back* v. *Milbrath,* 118 Wis. 42, 94 N. W. 657; 23 R. C. L., p. 347; 53 C. J., p. 965.)

When scrutinized in the light of this purpose, it is pertinent to observe that the remittances made and commissions retained were in absolute accord with the written agreements here sought to have reformed. In some of the letters detailed accounts were enclosed, purporting to show the exact status of the Smart and Butler contracts with regard to payments made, balances remaining, and amounts retained by plaintiff as its commissions. All of these entries give truth and life, not to some interpretation or meaning different from that evidenced by the written agreements, but to the written agreements themselves. The amounts remitted early exceeded what would have been necessary to have been sent in under the reformation theory of the agreements.

It must be remembered that, as the Smart commission agreement was written, plaintiff was not authorized to retain full

payment until the selling price, $4,812.60, less two-thirds of the net price, $3,240, or $2,160, had been paid, while under the reformed provision it was entitled to retain all payments as soon as one-third of the net price, or $1,080, was paid. The record shows beyond doubt that as early as September, 1927, the $1,080 figure had been exceeded. In November, 1927, plaintiff rendered a statement on both contracts. That statement showed receipts on the Smart contract of $1,973.78 on September 15, and $522.57 on September 7, 1927. It showed that part of the payments were credited to interest, but that out of the September 15 payment $1,698.67 had been credited on principal, and out of the September 7 payment $311.39 was so credited; a total of $2,010.06 had been at that time credited on the principal sum due in addition to interest. It will thus be observed that these two payments alone exceeded one-third of the net price by nearly $1,000.

The same statement showed that at that time there had been paid on the Butler contract amounts far in excess of the third of the net price, and yet plaintiff continued to remit substantial amounts on both contracts in accordance with the terms of the commission agreements as written—amounts that were obviously in excess of the amounts it would have been required to have remitted under the theory of the reformed provisions.

Finally, in 1934, after the culmination of approximately nine years of handling and remitting payments and retaining commissions in the manner indicated by the letters covering the intervening years, the following letter was written by plaintiff to defendant. It is dated April 6, 1934, and the pertinent part reads as follows: "Mr. Smart owes approximately $2,176.36, principal on this contract and about three years interest. You folks have a $749.57 interest in this contract and we have $1,417.00 coming and the Commission Agreement provides that any payments made on the contract from now on will be applied on our commissions until such commissions are paid in full." These figures, when computed under the plan and manner outlined in the Smart commission agreement as written, come within a few dollars of conforming to the exact terms thereof.

In striking contrast, these figures, when applied under the reformation theory advanced, are far out of proportion to the amounts that should obtain under the latter theory. This letter, bearing such late date in this long series of business transactions, is of importance here because it marks and evidences a further adherence to the strict terms of the commission agreements as written, that is, it is a written confirmation of the fact that at that point in the payment and remittance process, it was departing from the percentage arrangement of the agreement contained in the first part thereof, and putting into operation the second half of the agreement.

Further substantiation of plaintiff's understanding of the agreement to be as written appears in the following letter dated May 10, 1934, written by secretary Cook to defendant's attorneys: "The last two or three payments that were made on this contract were credited to commissions. This is in accordance with our commission agreement executed the 6th day of February, 1926, with H. R. Potter, Trustee and the Cook-Reynolds Company. On the second page it states that when the Smarts have paid to the party of the first part all of the purchase price named in the said contract for deed, with the exception of an amount equal to two-thirds of the said net price of $3,240.00 to be received by the party of the first part for said land, that then the party of the second part shall be entitled to receive all of the succeeding payments made by the said L. E. Smart, etc."

In the face of such convincing evidence it is difficult for us to believe that the plaintiff company was not proceeding in strict accordance with the commission agreements as written. It is to be noted that in the last letter above set out, plaintiff singles out the very part of the agreement upon which it is relying,—a part in exact conflict with that for which it now contends. This and the letter of April 6, 1934, when considered in the light of the business practice prevailing throughout the many years immediately preceding, leads us persuasively to the conclusion that plaintiff and defendant were in one accord in an understanding of the commission agreements as written.

Plaintiff offered in explanation of the remittances which were in excess of the amounts required under the reformation theory, that through some mix-up in the office card index with relation to the various land contracts the mistake of remitting too much was made. Such mistake and explanation, while no doubt possible, seem weak and unsatisfactory in view of the manner and method of remitting engaged in over a period of nearly ten years. Particular discredit is thrown upon the contention of plaintiff by reason of the fact that much of the correspondence, many of the letters written by the officers of plaintiff, indicate that the contract and its terms were constantly before them at the time they wrote the letters.

It is significant, also, that never until the suit was at issue and the trial was proceeding did the officers of plaintiff assert that a mistake had been made. The witness Cook, who claimed that he was present when the agreement was entered into and who was apparently an active executive officer of plaintiff corporation, still maintained on the stand that the agreement as written meant the same as the amendment, and only consented to a reformation on behalf of his corporation conditioned upon the fact that the provision was capable of some construction other than the one he was then giving it. This explanation might have been convincing but for the fact that he and his fellow officers had constantly and consistently remitted in accordance with the plain meaning of the contracts as originally drafted.

It is of interest to note that the oral negotiations of June 3, 1925, seeking a change in the commission agreements, were not reduced to memorandum form until February 6, 1926, some eight months later. As a review of the evidence has disclosed, when drafted, they did not contain the same version of those oral negotiations as did the letter received by Potter from Sexmith, his authorized Montana agent. No evidence was introduced bearing on the relationship or negotiations between the parties during this intervening period, although Cook testified that president Reynolds' understanding of the arrange-

ment was the same as Sexmith's and his own, as evidenced by the Sexmith letter.

While the record is not entirely clear as to whether Reynolds drafted the agreements, yet the capacity in which he was serving the company, coupled with the inferences to be drawn from the testimony, leave little doubt in the matter. In this connection it is noticeable that neither Reynolds nor Ottman, president and secretary, respectively, at the time the agreements were drawn and whose names appeared on the commission agreements in behalf of the plaintiff company, were called to testify or their depositions taken. Having prepared and signed the agreements, their testimony would be worthy of consideration here. Theirs would have been the best evidence on the point. (Compare *Cheadle* v. *Bardwell,* 95 Mont. 299, 26 Pac. (2d) 336.) No explanation appears as to why their testimony was not secured. (Compare *Fitschen* v. *Thomas,* 9 Mont. 52, 80, 2 Pac. 450. See, also, subd. 7, sec. 10672, Rev. Codes.)

The author in 12 American Jurisprudence, section 249, page 787, clearly states the general rules that obtain where the course of conduct of the parties has established a practical interpretation of an ambiguous contract. Those rules of practical construction, in our opinion, should apply with even greater force and effect where, as here, there is no question of ambiguity of meaning in the terms themselves, and where the exact terms of the agreements as written have been faithfully followed throughout the entire period of their operation until the present litigation. We approve the following quotation from the authority above cited: "In the determination of the meaning of an indefinite or ambiguous contract, the interpretation placed upon the contract by the parties themselves is to be considered by the court and is entitled to great, if not controlling, influence in ascertaining their understanding of its terms. In fact the courts will generally follow such practical interpretation of a doubtful contract. It is to be assumed that parties to a contract know best what was meant by its terms and are the least likely to be mistaken as to its intention; that each party is alert to protect his own interests and to insist on his rights; and that

whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be. Parties are far less likely to have been mistaken as to the meaning of their contract during the period when they are in harmony and practical interpretation reflects that meaning than when subsequent differences have impelled them to resort to law and one of them then seeks an interpretation at variance with their practical interpretation of its provisions. Where the language of a contract is uncertain and the parties thereto, by their subsequent acts and conduct, have shown that they construed it alike and within the purview of the constructions permitted as possible by such language, the courts will ordinarily follow such adopted construction as the correct one."

In our opinion, the evidence which includes all of the facts and circumstances of the case, including the letters of plaintiff corporation, demonstrates such a plain, specific and understanding adherence to the contracts as written as to preclude the new theory of the case introduced for the first time by amendment at the trial. We hold, therefore, that the court was in error when it found that a mutual mistake had been made, and that plaintiff was entitled to have the contract reformed and enforced. To us it seems that, even though there was a mistake made in the beginning, plaintiff and its officials had every opportunity to discover the mistake and that it acquiesced in the contract as written for so long a time and with such apparent understanding of it that the effort to avoid its terms at this late day cannot be sustained in the light of all of the things that we have pointed out.

The judgment is reversed with direction that the action be dismissed.

ASSOCIATE JUSTICES ANDERSON, MORRIS and ANGSTMAN concur.

MR. CHIEF JUSTICE SANDS being absent on account of illness, takes no part in the foregoing decision.