MORRIS LIPSKER AND FRIEDA LIPSKER, TRUSTEES UNDER THE WILL OF HYME LIPSKER, ET AL., PLAINTIFFS AND APPELLANTS, v. BILLINGS BOOT SHOP, A CORP., DEFENDANT AND RESPONDENT.

No. 9408.
Submitted June 3, 1955. Decided October 5, 1955.
288 Pac. (2d) 660.

Messrs. Coleman, Jameson & Lamey, James H. Kilbourne and Frank A. Gallagher, Billings, for appellant.

Messrs. Longan & Jones (Franklin S. Longan and Robert L. Jones), Billings, for respondent.

Mr. Gallagher and Mr. Jones argued orally.

MR. CHIEF JUSTICE ADAIR:

This is an appeal from a judgment entered in an action of unlawful detainer.

Morris Lipsker and Frieda Lipsker, trustees under the will of Hyme Lipsker, deceased, and Frieda Lipsker, individually, plaintiffs and appellants herein, are the owners of the Babcock Building in Billings, Montana.

In 1951 said owners by a duly executed written agreement leased to Billings Boot Shop, a Montana corporation, defendant and respondent herein, certain ground floor and basement space in said building known and designated as 120 North Broadway for a term of five years from and after July 1, 1951, at a monthly rental of $250.

The lease agreement sets forth twelve consecutively numbered covenants the sixth whereof reading:

"And for the purpose of this lease it is hereby expressly covenanted and agreed as follows, to-wit: * * *

"6. That the lessee will not assign this lease, or any interest hereunder, and will not permit any assignment hereof by operation of law, and will not sublet the said premises or any part thereof, and will not permit the use of said premises by any other parties than the lessee and the agents and servants of the lessee, without, in each and every case, the written consent of the lessors first had and obtained.

"The sale and transfer by the present stockholders of fifty per cent (50%) or more of the stock issued by the corporation shall be considered an assignment of this lease and in violation of the restrictions of this paragraph."

The instant action stands or falls upon the meaning and legal effect of the above quoted sixth covenant.

The lease agreement was originally made with the defendant Billings Boot Shop, a corporation, which corporation from the beginning was and still is the lessee of the demised property.

At the time the lease was entered into there were but 213 shares of the capital stock of Billings Boot Shop, the defendant lessee, issued and outstanding same being held as follows:

| | |
|---|---|
| L. S. Wolcott | 187 shares |
| Frances E. Wolcott, his wife | 1 share |
| Frank Strickland | 25 shares |
| Total | 213 shares |

Shortly after the lease was entered into L. S. Wolcott decided to withdraw from the business. With this end in view Wolcott, Strickland and Billings Boot Shop, the lessee corporation, agreed Wolcott would transfer to the Billings Boot Shop all the outstanding shares of stock held by him (Wolcott) and his wife for a consideration of $9,702.70 in cash and the cancellation by the Billings Boot Shop, a corporation, of an indebtedness of $9,-552.27, owed by Wolcott to such corporaiton.

Under date of November 6, 1951, the Lipskers, who executed the original lease agreement with the Billings Boot Shop, made and gave their written consent to the above transfer which consent reads:

"Consent to Remodeling and Reorganization

"We, Morris Lipsker, Executor and Frieda Lipsker, Executrix of the Estate of Hyme Lipsker, deceased, having heretofore on the 1st day of September, 1951, entered into a lease agreement with Billings Boot Shop, Incorporated, a Corporation of Billings, Montana, agree as follows:

"1. It is understood that L. S. Wolcott intends selling his corporate stock to the corporation and retiring said stock retaining only one share of said corporate stock and his directorship in said corporation, and in accordance with the terms of the lease, the transfer of this stock might be considered as a breach

of the covenants thereof. We, therefore, agree that the transfer of the stock of L. S. Wolcott to the corporation, the same to be retired by the corporation shall not be considered a breach of said lease and consent to this transfer.

"2. We further understand that the corporation intends certain remodeling consisting of closing in the present stairway, constructing a new visible front to the building and contemplates the installation of new furniture and fixtures consisting of shelving, rugs and furniture, and we hereby consent to this remodeling.

"In witness whereof, We have hereunto set our hands this 6th day of November, 1951.

> /s/ Morris Lipsker
>
> Morris Lipsker, as Executor
>
> /s/ Frieda Lipsker
>
> Frieda Lipsker, as Executrix"

Following the execution of the above written consent the L. S. Wolcott shares of stock were cancelled and retired and of the 25 shares originally issued to him Frank Strickland transferred two shares to his wife, Ethel Strickland, and one share to L. S. Wolcott. The remaining 22 shares were retained by Strickland.

To finance the acquisition of Wolcott's shares, the remodeling of property and the purchase and installation of new furniture, Billings Boot Shop borrowed from Shoenterprise Corporation of St. Louis, Missouri, the sum of $26,500, which loan was evidenced by a note secured by a pledge agreement under which all the twenty-five shares of stock issued and outstanding of the Billings Boot Shop were pledged as security for the payment of such loan and Strickland, his wife and Wolcott endorsed in blank and delivered their said certificates of stock, representing all the issued outstanding stock of Billings Boot Shop, the lessee corporation, to said Shoenterprise Corporation to hold as security.

Upon making the above loan the Billings Boot Shop, Strick-

land, his wife and Wolcott executed an agreement with said Shoenterprise Corporation to the effect that said Boot Shop will engage in the retail shoe business at Billings, Montana, and conduct such business strictly according to the requirements of the Merchant Service Department of International Shoe Company. It appears that the Lipskers did not consent to the above pledge of the stock and that they had no knowledge of it.

In late January or early February 1953, when Billings Boot Shop was *not otherwise in default,* Shoenterprise, deeming itself insecure, and acting under the insecurity clause in the note, declared the balance due. Payment was not made and on February 28, 1953, Strickland, his wife and Wolcott all resigned as officers and directors of the Boot Shop and surrendered their shares to Shoenterprise and its nominees in full satisfaction of the outstanding indebtedness.

The lessee corporation Billings Boot Shop has made timely tenders of all rent due since this controversy arose but the plaintiff lessors have refused such tenders.

On February 28, 1953, the Shoenterprise Corporation executed a receipt to Mr. and Mrs. Strickland and Wolcott for their 25 shares of stock and stated therein that said promissory note for $26,500 was cancelled.

Since February 28, 1953, Billings Boot Shop, the lessee corporation, has been and now is in the control of said Shoenterprise Corporation, which is now the holder of all the issued and outstanding stock of said Billings Boot Shop, and since February 28, 1953, neither Strickland nor his wife nor Wolcott have had any share or interest in said Billings Boot Shop.

On March 3, 1953, the Lipskers caused a written notice to be prepared and on March 4, 1954, caused the sheriff to serve same upon the Billings Boot Shop, which notice reads as follows:

"Billings, Montana

"March 3, 1953

"To the Billings Boot Shop, a corporation

"120 North Broadway

"Billings, Montana

"Gentlemen:

"Reference is made to lease dated September 1, 1951, between Morris Lipsker and Frieda Lipsker, as executors of the estate of Hyme Lipsker, deceased, and you covering premises in Babcock Building, Billings, Montana, known as 120 North Broadway, and particularly to the second paragraph of paragraph 6 of said lease which provides:

" 'The sale and transfer by the present stockholders of fifty per cent (50%) or more of the stock issued by the corporation shall be considered an assignment of this lease and in violation of the restrictions of this paragraph.'

"We are informed that there has been a transfer by Frank Strickland and his wife of their stock in the Boot Shop in satisfaction of certain indebtedness, which stock at the time of transfer constituted more than 50% of the issued and outstanding stock of the Boot Shop.

"We have not consented to such a transfer and we consider such a transfer a violation of the terms of the lease resulting in a termination of the lease.

"We, therefore, give you notice that if such a transfer has occurred, you are required to surrender possession of said premises within four days after the service upon you of this notice, excluding the date of service.

"If such a transfer has not occurred, please furnish us reasonable proof within that time that no such transfer has been made.

"If you fail to furnish such proof or if you fail to surrender possession within the time specified, we shall assume such trans-

426

fer has occurred and shall hold you for damages for unlawful detainer.

> "Yours very truly,
> Morris Lipsker and Frieda Lipsker
> Trustees under the will of Hyme Lipsker.
> /s/ Morris Lipsker
>     Morris Lipsker
> /s/ Frieda Lipsker
>     Frieda Lipsker
> "Frieda Lipsker, Individually
> By /s/ Frieda Lipsker"

"P.S. We are returning herewith your check dated February 21, 1953, for March rent."

On March 28, 1953, a similar notice addressed to the Billings Boot Shop was written by counsel for plaintiffs and served by the sheriff on the Billings Boot Shop. The notice stated that if possession of the property was not surrendered on or before three days from the date of such notice, an action will be commenced against the lessee corporation to recover the premises and damages.

Possession was not surrendered by the Billings Boot Shop and on April 7, 1953, the plaintiffs and appellants herein commenced in the Justice Court of Billings Township before Emil Borberg, Justice of the Peace, this action of unlawful detainer. Upon a trial had before a jury in his court, said justice of the peace assumed to "direct" a verdict for the plaintiff lessors and then entered judgment for plaintiffs ordering the defendant lessee to surrender possession of the leased property and to pay damages at the rate of $250 per month from March 1, 1953. However the justice of the peace declined to treble such damages. From such judgment the defendant appealed to the district court of Yellowstone County where, upon the agreed case submitted, the district court found and entered judgment for the defendant lessee from which judgment the plaintiff lessors have appealed to this court.

The briefs of both the appellants and the respondent disclose that this entire case depends upon the construction of the above quoted sixth covenant of the lease and upon whether the agreed case shows a violation by defendant of such sixth covenant.

It is agreed that at the time the Shoenterprise Corporation decided to declare the unpaid balance due on its loan, the defendant Billings Boot Shop *was not in default and also that it had made timely tenders of all rent due* which were refused by the plaintiff lessors.

R.C.M. 1947, section 58-212, provides: "*Conditions involving forfeiture—how construed.* A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created." See Finley v. School District No. 1, 51 Mont. 411, 416, 153 Pac. 1010; Henderson v. Daniels, 62 Mont. 363, 373, 205 Pac. 964.

The construction of the sixth covenant of the lease, in the light of the above statutory rule, wholly fails to show any voluntary assignment of the lease that is violative of such covenant.

The transfer of the 187 shares of stock of L. S. Wolcott to the Billings Boot Shop, to be cancelled and retired by said corporation, was not an assignment of the lease and such transfer was made with the express written consent of the plaintiff lessors as shown above. Compare Ser-bye Corporation v. C. P. & G. Markets, 78 Cal. App. (2d) 915, 179 Pac. (2d) 342, 345; Burrows Motor Co. v. Davis, D.C. Mun. App., 76 A. (2d) 163, 165; Wagner v. Shapona, 123 Cal. App. (2d) 451, 267 Pac. (2d) 378, 385; Alabama Vermiculite Corp. v. Patterson, D.C., 124 F. Supp. 441, 445.

The landlord's consent to the assignment of a lease obviates the necessity of consent to subsequent assignments. Aste v. Putnam's Hotel Co., 247 Mass. 147, 141 N.E. 666, 667, 31 A.L.R. 149 and note at page 153.

In the Aste case, supra, the court said: "The principal exception taken by the defendant was 'to the ruling of the court that where consent had been given to one assignment of the lease, no

other consent was necessary, and that there was no necessity to get written consent thereafter.' " Citing a number of cases in support of such statement.

The Aste case, supra, is followed in Barber v. Hyder, 52 N.M. 421, 200 Pac. (2d) 717, 719, and in Webb v. Jones, 88 Cal. App. 20, 263 Pac. 538, 541. In the Webb case, supra, the court said: "In relation to assignments by lessees under a lease containing a covenant against assignment without consent such as found in the lease under consideration, our courts have held that the covenant is personal, binding only upon the lessee, and does not run with the land. Such consent once given by a lessor discharges the covenant, and subsequent assignments may be made without such consent unless there is appropriate language in the lease making the covenant binding upon the subsequent assignees. Miller v. Reidy [85 Cal. App. 757], 260 Pac. 358, and cases cited therein. See, also, Ericksen v. Rhee, 181 Cal. 562, 185 Pac. 847; Rothrock v. Sanborn, 178 Cal. 693, 174 Pac. 314."

In Crowell v. City of Riverside, 26 Cal. App. (2d) 566, 80 Pac. (2d) 120, 123, the court recognized the rule as stated in the above cases and said: "As applied to assignments of leases, we understand this doctrine of single or continuous conditions to mean substantially this: that where a lease contains a covenant by the lessee not to assign without the lessor's permission and provides that a violation thereof shall entail a forfeiture, but such covenant is not, in terms, stated to be binding on the lessee's assigns, or on the lessee's heirs, successors and assigns, there the covenant is said to be *single,* that is, to inhibit no assignment other than one by the lessee. In such a case, therefore, if the lessee obtains permission to assign, and does so, his assignee is under no inhibition to make further assignments because the original lease only inhibits the original lessee from assigning and does not by its terms inhibit his assignee from doing so. Chipman v. Emeric, 5 Cal. 49, 63 Am. Dec. 80; German American Sav. Bank v. Gollmer, 155 Cal. 683, 102 Pac. 932, 24 L.R.A., N.S., 1066."

Appellants lay much stress on the last sentence of the above

quoted sixth covenant of the lease. However such last sentence limits the sale or transfer, "by the *present stockholders* of fifty per cent (50%) or more of the stock issued" in order to be considered an assignment in violation of the restrictions of the covenant.

As shown above, on September 1, 1951, at the time the lease was entered into there were 213 shares of stock issued and outstanding of which L. S. Wolcott owned 187 shares. Fifty per cent of these 213 would be 106½ shares of stock. However, the agreed case shows that on November 6, 1951, the plaintiffs made and executed their written consent to the selling by Wolcott of 187 shares of his stock to Billings Boot Shop, the defendant corporation.

The remaining 25 shares of the stock of the defendant corporation owned by Strickland, his wife and Wolcott were pledged by them to the Shoenterprise Corporation on November 12, 1951, as security for the payment of a promissory note for $26,500 but such pledge did not constitute a violation of the provisions of the last sentence of the sixth covenant of the lease, especially when, as shown above, the Shoenterprise Corporation, in February 1953, when the defendant *was not otherwise in default* deemed itself insecure and *declared the balance of the note was due,* whereupon the three directors of the defendant corporation resigned as officers and surrendered their 25 shares of stock to the Shoenterprise Corporation in full satisfaction of their indebtedness to it. This transaction did not constitute a violation of the last sentence of said sixth covenant as it was not a sale and transfer by 50 per cent or more of the stockholders who signed said lease in September 1951. The transaction were merely a surrender of the 25 shares of stock that had been pledged as security for the payment of the $26,500 loan, made to finance the purchase by defendant of the 187 shares of stock owned by Wolcott and to finance the remodeling of the store and the acquisition of new furniture for the store. By such demand for payment the Shoenterprise Corporation became the owner of the 25 shares of stock but still left the defendant Bil-

lings Boot Shop in possession of said store and business and Billings Boot Shop continuously remained in possession of said building and store until the action for unlawful detainer was commenced by plaintiffs on April 7, 1953, and since such time such defendant corporation lessee had and has made timely tenders of all rent due up to that time which tenders were refused by plaintiffs.

Upon filing in the district court of the agreed case and the briefs of counsel for the respective parties the district judge made and filed, at the time of entering the judgment in favor of the defendant, a memorandum opinion reviewing the agreed facts which memorandum, in part, recites:

"In such a case, the courts, as well illustrated by decisions cited in the briefs, have held that forfeiture of rights under leases, are not favored and such agreements for forfeiture must be strictly construed. Whatever may have been the intention of the parties, at the time the lease was made, we must be governed by the language used, and cannot put into that language something which is not there. There were 213 shares of the capital stock of the defendant 'issued and outstanding' at the time the lease was entered into. (See first Paragraph, Page 2, Agreed Statement.) Under the lease, the sale and transfer of more than 50% of the stock must be made by 'the present stockholders.' The stock referred to, unless we resort to speculations, must refer to the stock issued at the time the lease was made. In view of the strict construction required and of the fact that forfeiture is not favored, I can come to no other conclusion than that under the strict terms of the lease, there has been no sale and transfer by the 'present stockholders of 50% or more of the stock issued by the corporation' referring to the time of the lease, except the sale by Wolcott, which was approved and consented to by the plaintiffs. As repeatedly found in the cases cited, the rule is well settled that a forfeiture may never take place by implication, but must be effected by plain, unambiguous language."

It is clear that the pledge of the 25 shares of stock by de-

fendant to the Shoenterprise Corporation, when so demanded for security on said $26,500 note, was an *involuntary transfer* and not an assignment, sale or transfer constituting a breach of the sixth covenant of the lease. Also the surrender of said stock when demanded by said Shoenterprise Corporation was an *involuntary transfer*.

In 3 Thompson on Real Property, section 1431, page 665, it is said: "Effect of Transfer by operation of law.—It is universally held that a provision restraining the assignment of a lease includes only voluntary assignments, and is not operative against an assignment effected by law, or through an order of court. So, an ordinary covenant against subletting and assignment is not broken by a transfer of the leased premises by operation of law * * *" See also 51 C.J.S., Landlord and Tenant, section 33d (2), page 545; 32 Am. Jur., Landlord and Tenant, section 335, page 300; Chapman v. Great Western Gypsum Co., 216 Cal. 420, 14 Pac. (2d) 758, 760, 85 A.L.R. 917; Miller v. Bankers' Mortgage Co., 130 Kan. 543, 287 Pac. 618; McDonald v. Farley & Loetscher Mfg. Co., 226 Iowa 53, 283 N.W. 261, 263.

The judgment of the district court was "that the plaintiffs take nothing by this action and the defendant have and recover his costs herein as provided by Section 93-9502, R.C.M. 1947 * * *"

The record shows the costs of defendant, prior to the trial were $10.

Finding no reversible error herein the judgment is affirmed.

MR. JUSTICE BOTTOMLY concurs.

MR. JUSTICE DAVIS (concurring):

I agree that the statement of the facts upon which this controversy has been submitted shows no breach of the stipulation against assignment which is found in this lease. Accordingly I concur in the affirmance of the judgment of the district court; but I do so upon a much narrower ground than are the reasons given in the opinion of the Chief Justice.

Specifically I affirm for the reasons which the trial court gave in his memorandum decision to this effect: "* * * Under the lease, the sale and transfer of more than 50% of the stock must be made by 'the present stockholders.' The stock referred to, unless we resort to speculations, must refer to the stock issued at the time the lease was made. In view of the strict construction required and of the fact that forfeiture is not favored, I can come to no other conclusion than that under the strict terms of the lease, there has been no sale and transfer by the 'present stockholders of 50% or more of the stock issued by the corporation,' referring to the time of the lease * * * As repeatedly found in the cases cited, the rule is well settled that a forfeiture may never take place by implication, but must be effected by plain, unambiguous language."

I think this disposition of the case is sound. Without adding anything to these four quoted sentences I could well rest my concurrence upon the reasons given there by the district judge for his judgment. But because the Chief Justice has gone into greater detail, I am tempted to do likewise.

This court in accord with other courts generally is committed to the rule that forfeitures are looked upon with ill favor, and will be enforced only when the strict letter of the contract requires it. Otherwise stated, to provide for a forfeiture, the intention of the parties that the language employed shall have that effect must not only be plainly expressed, but also written in words which when strictly construed against the party for whose benefit the forfeiture is created clearly and without ambiguity require a forfeiture in the case put. R.C.M. 1947, section 58-212; Finley v. School District No. 1, 51 Mont. 411, 416, 153 Pac. 1010; 3 Williston on Contracts (Rev. Ed.), section 620, page 1787.

It is equally well settled in the law that the covenant or condition in this lease which clogs the right of the lessee to assign is a restriction upon its right of alienation, and is therefore likewise to be strictly construed against the lessors. Here again this paragraph finds no favor with the law; its language and

impact will not be extended either by construction or implication. Lawrence v. Cooper Independent Theatres, 177 Kan. 125, 276 Pac. (2d) 350; 51 C.J.S., Landlord and Tenant, section 33(b), pages 541, 542; 35 C.J., Landlord and Tenant, section 61, pages 978, 979; 32 Am. Jur., Landlord and Tenant, section 327, pages 296, 297. Precisely in point the Supreme Court of California has said in Chapman v. Great Western Gypsum Co., 216 Cal. 420, 426, 14 Pac. (2d) 758, 760, 85 A.L.R. 917, that "covenants limiting the free alienation of property such as covenants against assignment [of a lease] are barely tolerated and must be strictly construed. * * *"

I do not find it necessary, however, to go to this extreme to dispose of this case. Consistent with R.C.M. 1947, sections 13-702, 13-704, 13-707 and 93-401-15, upon which the plaintiffs rely to sustain their appeal, I read the disputed paragraph for precisely what I see in it. To avoid a forfeiture, I give that language nothing more than its ordinary meaning, as I understand it; a meaning which to me is neither strained nor absurd. But conversely, to sustain a forfeiture, I will read nothing by way of implication into the language of this lease which is not already there clearly and plainly expressed.

So read this paragraph means to me just one thing, viz., that if L. S. Wolcott, Frances E. Wolcott and Frank Strickland, who were the "present stockholders" of the defendant corporation on September 1, 1951, when this lease was made, had sold and consequent upon that sale had transferred as a group to Shoenterprise Corporation 50% or more of the 213 shares of the stock which was issued on September 1, 1951, then the covenant of this lease would have been breached; its condition would have been broken; and a forfeiture might have been enforced, unless the lessors consented. But this is not our case.

For L. S. Wolcott, Frank Strickland and Ethel Strickland, the stockholders who transferred the 25 shares to Shoenterprise Corporation, were not on September 1, 1951, the "present stockholders"; nor did they transfer 50% or more of the stock issued on that date. Rather they were at best two only of the

"present stockholders" mentioned in the lease; they transferred less than 50% of the stock issued on September 1, 1951, which is the only point of time mentioned in paragraph six. Hence that paragraph was not violated; the condition of the lease was not broken; and no forfeiture resulted, because the lessors did not consent.

To construe this paragraph as plaintiffs' counsel argue I should, and accordingly to work a forfeiture, I must read the language of paragraph six as though it ran thus: "The sale and transfer by any one or more of the present stockholders of fifty per cent (50%) or more of the stock issued by the corporation and outstanding at any time hereafter * * *" This I decline to do for the reasons I have given.

To the contrary, however, of my conclusion here it is argued, section 13-702 requires me to construe paragraph six together with all the rest of the lease that effect may be given to the "mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." I agree, and add that section 13-704, upon which reliance is also had, is equally explicit in its command that the intention is to be ascertained from the language of the writing itself, if that "language is clear and explicit, and does not involve an absurdity." The words used in paragraph six, whatever may have been the reasons behind them, are as I read them clear and explicit. Their meaning I am not to expand by construction; yet for me they involve no absurdity. I may not then consistent with section 93-401-15, upon which the plaintiffs' counsel also stand, read into this language other words which are not there, however earnest the argument to that end may be. I may not omit from this language words which are there. Nor may I force upon that language a construction which works a forfeiture where I am not clearly required to do so by the words actually used as they stand before me. I have not violated any of these rules, I believe, in reasoning to the result I reach.

I think the argument of counsel for the plaintiffs as presented would be apt, if the suit here were in equity to reform this para-

graph of the lease for mutual mistake. I think that argument is not apposite upon the facts here, which are stipulated in an action for unlawful detainer and accordingly take the language of the lease as it is written; and not as that language might be reformed to conform to what is now said to be the intention of the parties, an intention which I do not find expressed anywhere in the language actually used.

The plaintiffs' counsel have put one or more hypothetical cases designed to show that the construction which the lower court adopted and in which I concur leads to absurd results. Perhaps so. But results equally absurd follow when I test their theory of what paragraph six means by the same reasoning. After all upon any analysis this paragraph always yields one result which is the same, viz., that its language as written is inadequate to cover all cases which may arise under it. One such case we have at bar, as I understand the facts; for on September 1, 1951, no one apparently foresaw the retirement of the Wolcott stock, or made provision in paragraph six against that event.

I do not see anything in the further argument made for the plaintiffs that the parties to this lease by what they have done under that lease have put a practical construction upon paragraph six which accords with the construction urged by the lessors, and which should therefore be adopted. To be specific: On November 6, 1951, the lessors in writing consented that Wolcott should transfer all but one share of his stock to the corporation that it might be retired. Because then in this writing it is recited that this ''transfer of this stock might be considered as a breach of the covenants'' of the lease, it is said for the plaintiffs that the parties have themselves construed the lease to forbid the transfer of February 28, 1953, to Shoenterprise Corporation, unless the lessors consented to that transfer also. As I see it this argument proves too much. It makes plain the point only that none of the parties were sure of their ground, but that all the parties intended to insure against a breach.

An isolated instance where the lessors have expressly con-

sented to what might be considered a breach falls far short of the evidence necessary to establish a uniform and continuous practice amounting to a stipulation by the parties that such a transfer was in fact a breach of the covenant or condition in question.

I agree that the rule laid down by this court in Cook-Reynolds Co. v. Beyer, 107 Mont. 1, 16, 79 Pac. (2d) 658, is sound. But I do not agree that we have a case here to which that rule may properly be applied; and I am satisfied the facts of that decision make the distinction I have in mind without further comment by me.

MR. JUSTICE ANDERSON: (specially concurring).

I concur in affirming the judgment. I agree generally with what is said by Mr. Justice Davis and specifically with his view that this case should be decided upon much narrower grounds than those upon which Mr. Chief Justice Adair predicated his opinion.

MR. JUSTICE ANGSTMAN: (dissenting).

To reach a proper conclusion in this case all of section 6 of the agreement between plaintiffs and defendant must be considered. It provides:

"6. That the lessee will not assign this lease, or any interest hereunder, and will not permit any assignment hereof by operation of law, and will not sublet the said premises or any part thereof, and will not permit the use of said premises by any other parties than the lessee and the agents and servants of the lessee, without, in each and every case, the written consent of the lessors first had and obtained.

"The sale and transfer by the present stockholders of fifty per cent (50%) or more of the stock issued by the corporation shall be considered an assignment of this lease and in violation of the restrictions of this paragraph."

It is true as stated in the foregoing opinions that this type of agreement will be strictly construed. That however does not

mean such an agreement will be ignored, treated as invalid or otherwise rendered unenforceable, nor prevent us from giving effect to the obvious intention of the parties. Such restrictive covenants are recognized as valid by our statute. R.C.M. 1947, section 93-9703.

The covenant contained in paragraph 6 of the contract of lease was designed to prevent a change in the controlling personnel of the firm constituting the lessee without the lessors' consent. In other words, plaintiffs, the lessors, were satisfied with the corporation as lessee so long as the three stockholders, Wolcott, his wife and Strickland, controlled the corporation, but under a fair interpretation of the agreement if a controlling interest in the corporation were to be assigned to a third person, plaintiffs must first be consulted and their consent obtained or there would be a termination of the lease.

A covenant against an assignment of a lease has been held to be breached when a partnership lessee organized a corporation and transferred the lease to it. Lewis on Law of Leases of Real Property, 2nd Ed., page 266; Emery v. Hill, 67 N.H. 330, 39 A. 266.

Likewise there is a violation of the covenant against assignment when the lease is to a corporation and by it assigned to a new corporation organized by the principal stockholders of the old corporation, even though the new corporation carries on the same business and under the same name as the old corporation. White v. Huber Drug Co., 190 Mich. 212, 157 N.W. 60, and see Plotkin v. Milwaukee Metal Working Co., 255 Wis. 456, 39 N.W. (2d) 439, 12 A.L.R. (2d) 174.

In H. P. Hood & Sons v. Perry, 248 Mass. 350, 142 N.E. 794, it was held that the transfer by a lessee corporation of all its assets and business to another corporation of the same name but organized under a different state constituted an assignment of the lease even though there was no substantial change in the management of the business.

It should be noted too that in the last cited cases there was no express covenant against assignment by operation of law or

against the transfer of a majority of the issued stock as in this case. I think it might well be urged that the covenant against assignment contained in the first part of section 6 was violated in this case. The opinion prepared by Chief Justice Adair in effect so holds when, in reliance on the rule quoted from 3 Thompson on Real Property, section 1431, page 665, it holds that the transfer of the 25 shares to the Shoenterprise Corporation was an involuntary transfer. The point overlooked by the opinion of Chief Justice Adair is that here there is a covenant against a transfer by operation of law expressly written into the lease agreement.

However, it is not necessary to consider whether the first part of section 6 of the lease was violated because it is clear to me that the covenant against transfer of 50% or more of the stock issued by the corporation was clearly violated. The purpose of this covenant was to prevent a change in the controlling interest in the corporation without the consent of the lessors. It could have no other purpose. The only reasonable conclusion to be drawn from the lease agreement is that plaintiffs were satisfied with the corporation as their lessee so long as the present stockholders (those holding the stock at the time of the agreement) held the controlling interest in the corporation. That is the only significance to be attached to the words "present stockholders" as used in the lease agreement. I think also that the clause "50% or more of the stock issued by the corporation" as used in the agreement means 50% of the stock issued at the time of the sale or transfer of the stock. The surrender by L. S. Wolcott of his shares of stock to the corporation effected their cancellation. They no longer represented shares issued by the corporation, when the sale and transfer of the remaining shares took place.

I see no applicability here of the rule that when the lessor consents to an assignment there is no need to procure the consent to subsequent assignments. Here the consent to the surrender by the Wolcotts of their stock to the corporation, excepting one share, was not a consent to an assignment of the lease.

That was simply a consent to the surrender of the stock back to the corporation and thus reducing the issued stock of the corporation. There was no assignment of the lease and there was no change in the personnel of the stockholders of the corporation excepting that Mrs. Wolcott no longer held any stock. The controlling interest still remained in Wolcott and Strickland. I think there was a breach of paragraph 6 of the agreement and this even though the present stockholders may be desirable and worthy successors to the original stockholders. White v. Huber Drug Co., supra.

It should be noted that the lessee corporation is what may be called a family corporation. As to corporations generally it is questionable whether an agreement restricting the right of stockholders to transfer their shares of stock would be valid. See, generally, 13 Am. Jur., Corporations, section 333, page 410. Here the restriction against transfer of the stock was imposed by the stockholders upon themselves. Both Wolcott and Strickland signed the lease. The one signed as president of the corporation and the other as secretary. Frances Wolcott, the other stockholder, held but one share of stock and she was the wife of L. S. Wolcott.

I think the judgment should be reversed.