## CAROLYN HADDAD v. PETER J. FRANCIS

SUPERIOR COURT                          HOUSING SESSION
JUDICIAL DISTRICT OF WATERBURY              FILE NO. 02061

Memorandum filed June 30, 1986

*Blazzard, Grodd & Hasenauer,* for the plaintiff.
*Brunnock & Cicchetti,* for the defendant.

BARNETT, J. In this summary process action, the plaintiff seeks to evict the defendant for failure to pay increases in real estate taxes and insurance premiums. According to the complaint, such defaults are to be treated as defaults in rent pursuant to the lease between the parties.

The defendant contends that the court lacks jurisdiction because his leasehold interest was assigned to PJR, Inc., a Connecticut corporation and the corporation is not a party to the action. With respect to the merits of the plaintiff's claims, the defendant contends that the increases in real estate taxes have been paid, that the provisions in the lease concerning increases in taxes and insurance premiums have not been breached and that whatever defaults may have occurred were not material breaches of the lease.

I

On March 15, 1977, a lease was executed between the plaintiff landlord, and the defendant and Roland Colucci, collectively, as tenant. The leased premises are located at 893–895 Meriden Road, Waterbury, and, as described in the lease, consist of "a bar-room, kitchen, dining room and storeroom downstairs and an office and storage room upstairs with an outside parking area sufficient for twenty cars." The lease specifies that the premises are to be used only for a "restaurant bar business" and for no other purpose without the written consent of the landlord. The lease provided for an initial term of five years commencing on May 1, 1977, with two successive five year option periods. At the present

time, the first of the two option periods is in effect. For both the initial term and the first option period, the rent is $6600 per year payable in equal monthly installments of $550 on the first day of each month.

Several provisions of the lease are material to the claims of the parties. At the outset, however, the court must discuss the defendant's jurisdictional claim or, in other words, explain how PJR, Inc., fits into the picture.

Paragraph 7 of the lease prohibits a subleasing or assignment without the consent of the landlord. A written assignment, to which the plaintiff consented was executed on April 4, 1977, prior to the commencement date of the lease. By the terms of the assignment, PJR, Inc., received all of the right, title and interest of the defendant and Colucci in the lease and they, in effect, became the guarantors of the corporation's performance. The document of assignment was executed by the defendant, Colucci and the plaintiff. Colucci also signed for the corporation.

When the assignment was executed, the defendant and Colucci were shareholders of PJR, Inc. At some later date, Colucci, in the defendant's words, "dropped out." No issue has been made of the absence of Colucci, as a party, in the present litigation.

As of May 1, 1977, when the tenancy began, PJR, Inc., was undoubtedly entitled to possession. The insurance that is required of the tenant, under the lease, has been renewed annually in the name of "PJR, Inc., dba My Place." The rental payments, both before and after the exercise of the option, however, have always been made by checks imprinted with the name "My Place Cafe" and have been signed by the defendant individually, with no reference to the corporation.

As noted above, the lease was renewed by the exercise of the first of the two year options. At issue, however,

is by whom. The plaintiff contends that the defendant exercised the option to renew on or about May, 1982. The defendant urges that the option was exercised by PJR, Inc. In the lease, a condition of the right to renew is a written notice from the tenant of the intention to exercise the option. Unfortunately, no such written notice which, by its terms would have identified the option or was ever introduced into evidence. Presumably no such notice was given.

Complicating the issue of whether PJR, Inc., is a necessary party to this action are two events which occurred before the option was exercised. On May 30, 1980, PJR, Inc., was dissolved by forfeiture for failing to file two successive annual reports. General Statutes § 33-387 (b). On April 29, 1981, the defendant, acting as an individual, sublet part of the leased premises to Mary's Diner, Inc., a seemingly unrelated corporation.

The sublease was for a period of one year commencing on May 1, 1981, with options to renew for five additional terms of one year each. The sublease describes the defendant as "Tenant" and Mary's Diner, Inc., as "Sub-Tenant." One provision of the sublease entitled "Warranty of Title" recites that the defendant "warrants that he has a valid lease to the premises and that he has and can deliver the peaceable possession thereof to Sub-Tenant on May 1, 1981." The final paragraph of the sublease states that "[t]his sublease is subject to the terms of the written lease of the Tenant and Landlord (a copy of which had been provided to the Sub-Tenant) and nothing herein shall be deemed to alter the terms of said lease." Conspicuously absent from the sublease is any reference to the assignment to PJR, Inc. At the trial, the defendant testified that the reason why the sublease was from him, individually, and not from PJR, Inc., was due to an error by his attorney.[1]

---

[1] This was not the attorney that represented the defendant at trial.

No evidence was introduced to show that the plaintiff, as required by paragraph 7 of the lease, had ever been asked to consent to the sublease. In this litigation, however, it is apparent that the plaintiff's principal concern with the sublease is the effect that it has on her insurance premiums.

Since both parties agree that the option was exercised, a landlord-tenant relationship obviously existed. The question of whether PJR, Inc., is an indispensible party depends upon whether PJR, Inc., had the status of "tenant" when the plaintiff by service of the notice to quit on December 10, 1984, purported to terminate the lease. It is undisputed that the notice to quit was served on the defendant and not on the corporation. Service of a notice to quit on the tenant is, of course, an indispensible prerequisite to the maintenance of a summary process action. *O'Keefe* v. *Atlantic Refining Co.,* 132 Conn. 613, 621, 46 A.2d 343 (1946).

The defendant argues that PJR, Inc., as the assignee of himself and Colucci, must be regarded as the tenant for two reasons. First, because the dissolution by forfeiture did not terminate the lease. And, second, because PJR, Inc., although dissolved, can still be sued in its corporate name. It is true that the dissolution of a corporation lessee, before the expiration of the term, does not constitute an automatic breach or termination in the absence of an express provision to that effect in the lease. Annot., 147 A.L.R. 360, 362. It is also true that "[a]ny action or proceeding by or against a dissolved corporation may be prosecuted or defended by the corporation in its corporate name . . . ." General Statutes § 33-378 (e); *Don Rich Corporation* v. *Rossini,* 1 Conn. App. 120, 122, 468 A.2d 1273 (1983). The court has no quarrel with the defendant's pronouncements of law. On the facts of this case, as established by direct and circumstantial evidence, however, the court finds

that the defendant's legal pronouncements have little, if any, relevancy.

A corporation dissolved by forfeiture, pursuant to § 33-387 (b) may reinstate itself within three years after dissolution. General Statutes § 33-388. The defendant testified that he had just learned of the dissolution and had applied for PJR, Inc.'s reinstatement.[2] The three year limitation period had long since gone by. Moreover, there was no evidence, other than the continuation of the insurance coverage in the corporate name to warrant a conclusion that, at any time after dissolution, PJR, Inc., did business as a de facto corporation. Cf. *Lettieri* v. *American Savings Bank,* 182 Conn. 1, 4, 437 A.2d 822 (1980).[3] Indeed, the more probative evidence points to a contrary conclusion.

The court considers the earlier discussed provisions in the sublease from the defendant to Mary's Diner, Inc., as telling admissions that the defendant knew of and acquiesced in the dissolution of PJR, Inc. In the sublease, the defendant warranteed that it was he who owned the leasehold and made no mention of PJR, Inc., as his assignee. When compared to the affirmative acts of asserting title, the routine renewal of the insurance policy becomes of lesser significance.

Upon dissolution, a corporation is supposed to wind up its affairs, satisfy its creditors and distribute its assets to its shareholders. See General Statutes § 33-378 (b). In essence that is what occurred here albeit in the most informal manner. The general rule is that after dissolution of a corporation, its property passes

---

[2] The notification of the dissolution was sent to:

P.J.R., Inc., Roland Colucci,
55 Edson Avenue, Waterbury

[3] In *Lettieri* v. *American Savings Bank,* 182 Conn. 1, 437 A.2d 822 (1980), the corporation dissolved by forfeiture continued to maintain a checking account, to hold real estate in its own name and to incur and pay debts.

to its shareholders subject to the payment of corporate debts. *Hampton* v. *Hampton Beach Improvement Co.,* 107 N.H. 89, 94, 218 A.2d 442 (1966).

What happens to a dissolved corporation's leasehold interests when there is no formal conveyance or assignment is a problem that, apparently, is seldom encountered. Where the question has been considered, the decisions appear to be uniform.

The decisive test for determining if the lease has remained with a corporation or has passed to its shareholders is whether the lease was abandoned or treated as a valuable asset. Only if the lease is abandoned, in the sense that it is repudiated, does it remain as a primary obligation of the corporation with a consequent claim by the landlord for damages. Otherwise, the lease passes to the shareholders who succeed to the rights and obligations of the corporation in the leasehold estate. *Middendorf* v. *Fuqua Industries, Inc.,* 623 F.2d 13, 17 (6th Cir. 1980); *Rauch* v. *Circle Theatre Co.,* 176 Ind. App. 130, 136–37, 374 N.E.2d 546 (1978); *Hampton* v. *Hampton Beach Improvement Co.,* supra, 94–95.

As for the lease at issue, the defendant's status has changed twice. The initial assignment to PJR, Inc., changed him from a tenant to a guarantor. See *Prospect Realty, Inc.* v. *Bishop,* 33 Conn. Sup. 622, 624, 365 A.2d 638 (1976). The dissolution of PJR, Inc., returned him to the status of a tenant. *Middendorf* v. *Fuqua Industries, Inc.,* supra. There can be no question that the lease was treated as a valuable asset. Otherwise, the option would not have been exercised and the present litigation would not exist. It necessarily follows that the defendant and not PJR, Inc., is the proper party defendant in this case.

## II

The merits of the case also present a preliminary question. A contested issue is whether the lease makes a default in the tenant's obligation to reimburse the landlord for increases in insurance premiums, as well as for increases in real estate taxes, the equivalent of a default in rent. The pertinent provisions of the lease are contained in paragraphs 10 and 24. Because of the factual nature of the plaintiff's claim, paragraph 9 is involved as well.

In paragraph 10, the parties agreed that the real estate taxes on the Waterbury grand list of October 1, 1975, were $1539.90 per year or $128.62 per month on an assessment of $17,700 at 87 mills. Real estate taxes, pursuant to paragraph 10 are the responsibility of the landlord but only to the aforesaid amount. Any increase in taxes caused by a change in assessment or mill rate is to be borne by the tenant and paid to the landlord thirty days prior to the date when the taxes are due. The remainder of paragraph 10 reads, as follows: "In the event that Tenant fails to make any payment of said increase in said taxes as aforesaid, Landlord shall be entitled with respect thereto, to any and all remedies to which Landlord may be entitled for default in payment of rent. Tenant shall also be responsible to reimburse Landlord for any increase in Landlord's insurance premiums occasioned by the operation of Tenant's business."

Paragraph 24 states: "The Tenant hereby agrees to be responsible to Landlord for payment of any increase in Landlord's insurance rates imposed as a result of the operation of the business on subject premises by Tenant."

Paragraph 9 sets forth the obligations of both the landlord and the tenant with respect to the amounts

and types of coverage that each is to maintain. As relevant to the present dispute, the tenant is obligated to provide general liability coverage in amounts not less than $100,000 for bodily injury to or death of any one person, $300,000 for any one accident and $40,000 for property damage. The landlord is required to provide insurance against hazards to the exterior structure in amounts satisfactory to the tenant. Paragraph 9 further provides: "Each party shall furnish the other with certificates of insurance evidencing the existence of the coverage required in this paragraph upon ten (10) days written notice."

As with any contract, the construction of a lease is a question of law. The intent of the parties as expressed therein is controlling. The lease must be construed as a whole and, if reasonably possible, effect must be given to every provision. *Robinson* v. *Weitz,* 171 Conn. 545, 551, 370 A.2d 1066 (1976); *Sacharko* v. *Center Equities Limited Partnership,* 2 Conn. App. 439, 445, 479 A.2d 1219 (1984). From a reading of the above paragraphs, it is plain that the two obligations of the tenant do not stand on the same footing despite the inclusion of both of them in paragraph 10. The obligation to pay increases in taxes is to be met unequivocally by a date certain in the same manner as a payment of rent. Its purpose is to provide the landlord with funds to make such payments before the payments are due. The insurance obligation, being in the nature of a reimbursement, requires notification from the landlord before any default can be claimed. And for the insurance required of the tenant by paragraph 9, a demand for the certificate is an obvious prerequisite to any claim for default.

## III

At the trial, the court ruled that any defaults in the tenant's obligations, either as to a failure to make payments for increased real estate taxes or a failure to

reimburse the landlord for increased insurance premiums, that occurred before the exercise of the option would not be considered as a ground for eviction. The determinative period, therefore, is from May, 1982, when the option was exercised, to December 10, 1984, when the notice to quit was served.

Taxes on a Waterbury grand list of October 1, in any given year, are billed in July (first installment) and February (second installment) of succeeding years. For the period between the exercise of the option and service of the notice to quit, payments were made for taxes on the grand list of 1981, 1982 and one half of 1983. The defendant concedes that if all of the increases in taxes were not paid by him, his total liability for "unpaid rent" is $1500.54. The court has reached the slightly higher figure of $1724.14.

The defendant claims to have paid the increases in taxes on a monthly basis. Payment is a special defense even, where, as in this case, nonpayment is alleged. Practice Book § 164. On the issue of payment, the defendant has the burden of proof. *Perley* v. *Glastonbury Bank & Trust Co.*, 170 Conn. 691, 698, 368 A.2d 149 (1976).

To support his claim, the defendant produced a host of checks many of which show monthly payments in excess of the base rent of $550. Although there was no testimony that the overages were for taxes, the court is asked to infer this fact upon the defendant's contention that there was no evidence that the increased payments were for another purpose.

The lease was executed contemporaneously with the purchase, in 1977, of the bar and restaurant business then being operated on the premises by Ernest Haddad, the plaintiff's husband. There was evidence that the purchase price was $50,000 and was being paid on some form of installment plan by which the defendant

and Colucci became indebted to Haddad. A check dated June 10, 1977, in the amount of $1216.80 contains the notation "Rent $550 Loan 668.80." Checks in the amounts of $1266 and $1825.60, without any notation as to purpose, are dated November 17, 1977, and March 22, 1978. Checks marked "Rent" in the amounts of $1166 and $1266 are dated December 27, 1977, and January 10, 1978, although from other checks, it appears that no rental arrearages existed on these dates. Certified check vouchers in the amounts of $1216 and $1216.80 are dated August 31, 1977, and September 14, 1987. The defendant testified that the monthly loan payments were between $600 and $700 and that each of the large checks included a rental payment of $550.

Four of the large checks were signed by Roland Colucci and one by James Coffey who was identified as PJR, Inc.'s accountant and a signer of checks after Colucci left the business. The last of the large checks is the one dated March 22, 1978, and signed by Coffey. Thereafter, from July, 1978, through October, 1982, the defendant increased his monthly payments in varying amounts of $580, $595, $610, $620 and $640. Starting with November, 1982, the monthly payments returned to the base rent of $550. In the plaintiff's brief, there is a suggestion that the increased amounts were for installment payments for the purchase of Haddad's business which the defendant made after Colucci departed and he was operating "My Place Cafe" by himself. The defendant, is correct, however, in his contention that no evidence was produced at the trial concerning the balance of the purchase price and how installment payments were being made.

Aside from the fact that increased payments do not encompass the complete period for which increases in taxes were owed, there was other evidence to rebut the advocated inference. On November 9, 1982, immediately after the increased payments stopped, the defend-

ant, in a letter from the attorney then representing him, rejected the plaintiff's demand that he pay increases in taxes on a monthly basis. Moreover, ample proof that no payments were made for taxes in 1983 and 1984 was supplied by the testimony of Ernest Haddad and Corinne Haddad.

## IV

Relying on *Simses* v. *North American Co. for Life & Health Ins.*, 175 Conn. 77, 394 A.2d 710 (1978), the defendant claims that the phrase "Tenant's business" in paragraph 10 is ambiguous and, hence, must be construed in his favor since the plaintiff's attorney drafted the lease. The court disagrees. The rule in *Simses* applies only where the terms of a contract are equally susceptible to two different meanings. Such is not the case here. When paragraphs 9, 10 and 24 are read together, they clearly delineate the insurance obligations of the landlord and the tenant. Each of the parties is required to provide specific types of insurance. And the tenant is responsible for any increase in the cost of the landlord's obligation resulting from the tenant's existing business or any other business which the landlord may permit the tenant to operate on the premises.

The court, however, agrees with the defendant's contention that the plaintiff has misconstrued the lease in her assessment of what is owed. From the terms of the lease, it is obvious that the defendant is not responsible for any portion of the plaintiff's premiums relating to liability insurance. Further, the plaintiff produced no evidence to show that the "poor housekeeping" condition which caused the increase in 1978 continued to exist after the option was exercised.

The court has computed the amount of the defendant's defaults on the insurance covenants in the lease to be $479 for 1983–84 and $131.50 for one half of

1984–85. In arriving at these amounts, the court has concluded that Mary's Diner, Inc., is a business of the tenant within the purview of paragraph 10 of the lease. Several reasons underlie this conclusion. First, the sublease was never authorized by the plaintiff as is required by paragraph 7 of the lease. The defendant is in the anomalous position of having breached one clause of the lease and claiming that the benefit of that breach should relieve him from an obligation imposed by another clause. Second, and perhaps more important, a review of the terms of the sublease demonstrates that Mary's Diner, Inc., and the defendant's My Place Cafe are closely connected, in fact, although they may, indeed, be separate legal entities. Both enterprises occupy and use the same essential facilities, kitchen, dining room and parking spaces at different times of the day. The sublease is not the usual "horizontal" type of arrangement whereby the lessee's estate is a present one and the lessor's estate is reversionary. Instead, the sublease is a rather unique "vertical" arrangement by which Mary's Diner, Inc., occupies the premises each day from 3:00 a.m. to 3:00 p.m., and My Place Cafe occupies the same premises for the remaining hours.

In part II of this memorandum, the conclusion was reached that the obligation of the tenant to reimburse the landlord for increases in insurance premiums was not, under the terms of the lease, the equivalent of a default in rent. As stated in part II, the concept of reimbursement would require notice of the amount due. It would also require a period of time for the tenant to comply. In these respects, the terms of the lease are vague. Normally, the absence of specific time periods in a contract are not a problem. The law can always supply a reasonable time. *Central New Haven Development Corporation* v. *La Crepe, Inc.,* 177 Conn. 212, 216, 413 A.2d 840 (1979). In an eviction action, however, the reasonableness of time can be one of the most

important issues. See *R & R of Connecticut, Inc.* v. *Stiegler,* 4 Conn. App. 240, 493 A.2d 293 (1985).

Under the circumstances of this case, notice of a default and adequacy of time for the curing of the default are simply not issues. As with tax increases, the parties have been in dispute on the subject of insurance premium reimbursements for several years.

## V

Remaining for discussion is the defendant's assertion that equity should prevent a forfeiture because his defaults are not material breaches of the lease. The principles governing equitable relief in lease situations are well known. " '[I]n cases of wilfull or gross negligence in failing to fulfil a condition precedent of a lease, equity will never relieve. But in case of mere neglect in fulfilling a condition precedent of a lease, which does not fall within accident or mistake, equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease.' " *Seven Fifty Main Street Associates* v. *Spector,* 5 Conn. App. 170, 174, 497 A.2d 96, cert. dismissed, 197 Conn. 815, 499 A.2d 804 (1985), quoting *Fountain Co.* v. *Stein,* 97 Conn. 619, 626–27, 118 A. 47 (1922).

The court has considered the question of equitable relief separately as it pertains to each of the grounds for eviction. In accord with the procedure suggested by *R & R of Connecticut, Inc.* v. *Stiegler,* supra, 245, it sets forth its findings as follows:

## A

### DEFAULT IN OBLIGATION TO PAY INCREASES IN REAL ESTATE TAXES

The court finds that the defendant's default constitutes wilfull or gross negligence and precludes equitable

relief. This obligation is an unequivocal one, pursuant to the terms of the lease, which the defendant has ignored for several years despite written notifications and requests to pay. At least two written notices were sent, one from Ernest Haddad in June or July of 1983, and one from Corinne Haddad dated October 5, 1984. Also, there has been correspondence between the parties themselves and their respective attorneys.

Further, on the question of gross or wilfull negligence, the court finds that by the terms of the sublease, Mary's Diner, Inc., was since May 1, 1982, and presently is obligated to pay the defendant the sum of $400 per month as rent. Since the defendant's base rent is only $550 per month, the payment of the increases in real estate taxes, as required by the lease, should have been accomplished.

## B

### DEFAULT IN OBLIGATION TO PAY INCREASES IN LANDLORD'S INSURANCE PREMIUMS

The court finds that the defendant's default constitutes negligence as differentiated from gross or wilfull negligence. The parties exhibited a misunderstanding as to the applicable provisions in the lease. The court has characterized the defendant's default as one of neglect rather than mistake for the reason that no serious effort was made to resolve the misunderstanding. If this default stood alone, the court would be disposed to granting equitable relief.

A judgment of possession and taxable costs is rendered for the plaintiff.