**SHAKEY'S INCORPORATED, Plaintiff,**

v.

**James F. CAPLE, Lang T. Brown, and Hue Gaiser, Defendants.**

No. LR–C–93–225.

United States District Court, E.D. Arkansas, Western Division.

March 10, 1994.

Judy Simmons Henry of Wright, Lindsey & Jennings, Little Rock, AR, and Jeffrey D. Germany of Neely, Green, Fargarson & Brooke, Memphis, TN, for plaintiff.

Richard T. Donovan of the Rose Law Firm, Little Rock, AR, for defendant.

## MEMORANDUM AND ORDER

SUSAN WEBBER WRIGHT, District Judge.

This is a declaratory judgment action in which the plaintiff, Shakey's, Inc. ("Shakey's"), contends that a real property Lease Agreement between itself and Buddy, Inc., a dissolved corporation, is terminated. The following motions are before the Court: (1) motion of defendants, James F. Caple ("Caple"), Lang T. Brown ("Brown"), and Hue Gaiser ("Gaiser"), for summary judgment; (2) motion of Shakey's for summary judgment on the counterclaim filed by Caple; and (3) motion of Shakey's to amend the complaint in order to add Hoa Chung Tran ("Tran") as a defendant. For the reasons that follow, the Court grants defendants' motion for summary judgment, grants Shakey's motion for summary judgment on Caple's counterclaim, and denies Shakey's motion to amend the complaint.[1]

### I.

Shakey's is a Delaware corporation engaged in the business of licensing operators of Shakey's Pizza Parlors on a nationwide basis. Buddy, Inc. is a dissolved Arkansas corporation formed by Caple, a former employee of Shakey's, to operate his Shakey's pizza franchises in central Arkansas. Caple served as Buddy, Inc.'s president and sole shareholder.

On April 28, 1977, Shakey's and Buddy, Inc. entered into a Lease Agreement for commercial property located in Little Rock, Arkansas. Buddy, Inc. was to operate a Shakey's Pizza Parlor franchise on the property and serve as the tenant on the Lease Agreement. The term of the lease was for twenty years, with an option to renew for an additional twenty years. Pertinent to this case, paragraph 18 of the Lease Agreement contained a general nonassignability clause providing that the "Lessee may not without the written consent of Lessor, assign, sublet, or encumber this lease or its rights hereunder, which consent shall not be unreasonably withheld."

By 1980 Caple was experiencing financial difficulty with his Shakey's franchise at the property. Caple eventually closed the parlor and, with Shakey's consent, subleased the property to Hon Yon Foung and Manlin Foung for the operation of a Chinese restaurant called the "China Town Restaurant."

---

1. Shakey's also has before the Court a motion for an extension of time in which to file pre-trial pleadings, a motion in limine, and a motion for a pre-trial conference. These motions are rendered moot by today's action and need not be addressed.

The term of the Foung sublease was to commence on March 1, 1982, with an option to renew for an additional five years.

For reasons not clear from the record, the Foungs wished to discontinue their operation of the China Town Restaurant not long after its opening. In October 1983 the Foungs and Buddy, Inc. executed a document assigning the sublease to Jenny Chung and Allen Chung. This assignment was approved by Shakey's with the understanding that Shakey's was not releasing Buddy, Inc. from its continuing obligations under the Lease Agreement. The Chungs would continue their operation of the restaurant for the next several years, exercising an option to renew the sublease in March 1987.

On December 29, 1986, during the term of the Chung sublease, Caple executed a "Certificate of Dissolution" dissolving Buddy, Inc. Caple took this action after his attorney recommended that the corporation be dissolved due to changes in the federal tax laws.[2] Pursuant to a "Plan of Liquidation" of Buddy, Inc., all assets of the corporation, including the Lease Agreement, were assigned to Caple as sole shareholder. Caple never informed Shakey's of Buddy, Inc.'s dissolution and concurrent assignment of the Lease Agreement to himself. Caple did, however, continue to meet the obligations required of him under the terms of the Lease Agreement.

In early 1989 Brown, an employee of the China Town Restaurant, and Gaiser, a friend of Brown's, expressed an interest in purchasing the restaurant. On February 27, 1989, Brown, Gaiser, Allen Chung, and Caple (using the name Buddy, Inc.) executed a document assigning the Chung sublease to Brown and Gaiser. Shakey's consented to this assignment not realizing that Buddy, Inc. had been dissolved.

With the sublease approaching termination, Brown, Gaiser, and Caple (again using the name Buddy, Inc.) signed a new sublease agreement in November 1991 for a term encompassing the period between March 1, 1992 and ending June 30, 1997.

This document was presented to Shakey's for approval no later than March 1992. Shakey's reviewed the sublease agreement and declined to give its approval, requesting instead that Caple submit updated financial information on Buddy, Inc. Caple did not provide the requested information, stating in a later deposition that "it wasn't any of their business," and Shakey's took no action on the request for approval of the November 1991 sublease.

Having failed to receive Shakey's approval for the sublease, the attorney for Caple and Buddy, Inc., Richard Donovan, wrote Shakey's a letter stating that Caple and Buddy, Inc. consider Shakey's to have approved the sublease. This letter, dated June 8, 1992, provides:

> As you are aware, the sublessees who currently occupy the space as a Chinese restaurant are assignees of an earlier sublease approved by Shakey's. Shakey's also approved the assignment of that sublease. With that sublease approaching termination, Buddy, Inc. and the current sublessees agreed to a new sublease for a 5-year, 4-month term.
>
> As you are also aware, Mr. Caple submitted for Shakey's approval that 5-year, 4-month sublease in November of 1991. Mr. Caple has yet to receive a response from Shakey's despite several telephone calls and correspondence. Mr. Caple complied with all requests for information.
>
> Given Shakey's familiarity with these sublessees (acquired by approval of an earlier assignment and subsequent financial disclosure), Buddy, Inc. and Mr. Caple are confident there is no reasonable justification for Shakey's to withhold consent to this sublease. Moreover, given Shakey's inaction for the past seven months since the tender of the proposed sublease, Buddy, Inc. and Mr. Caple consider Shakey's to have approved this sublease and will proceed accordingly.
>
> Therefore, please consider that Buddy, Inc. and Mr. Caple consider the sublease

2. On October 22, 1986, President Reagan signed into law the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085. Shakey's disputes Caple's assertion that he dissolved Buddy, Inc. for tax reasons but does not set forth any facts that would call into question Caple's assertion.

tendered to Shakey's in November, 1991 approved by Shakey's and assume that Shakey's consented to the sublease as required by paragraph 18 of the Lease Agreement.

Shakey's did not acknowledge this letter nor did Shakey's indicate its disapproval of the November 1991 sublease.

At some point Shakey's began inquiring into the status of Caple and Buddy, Inc. On September 15, 1992, Shakey's requested from the Arkansas Secretary of State information on Buddy, Inc. and Caple, specifically "[i]f the corporation was dissolved." Meanwhile, Shakey's had been proceeding with plans to have the property inspected. In a letter dated July 28, 1992, Shakey's informed Caple that it was exercising its right to examine the premises, and that a representative of Shakey's, Sam Davis, would contact Caple and make arrangements to inspect the premises within the next week. Apparently, Shakey's encountered difficulties in inspecting the property. In a letter dated August 11, 1992, Shakey's notified Caple that he had been "less than cooperative" in allowing Davis to inspect the premises, and that any further resistance would be viewed as a default under the Lease Agreement. Shakey's informed Caple that Davis would be inspecting the premises on August 17, 1992.

Following the inspection, Shakey's notified Caple by letter postmarked September 18, 1992, that the property has not been maintained in good structural condition and repair and that he should commence making certain repairs within five days of his receipt of the notice.[3] Upon receiving this letter Caple immediately wrote Shakey's and requested a "reasonable extension of time" in which to make the repairs. Caple claimed that the failure to receive approval for the November 1991 sublease was hindering his operations:

> I'm working under conditions which make it hard for me to ask the sub-tenants, Ms. Hue Gaiser and Ms. Lang Brown to make or repair the building since I have not

received the approved sub-lease agreement submitted to Shakey's Inc. to Mr. Vinson in November 1991 and again to Ms. Ramone [sic] in March 1992.

Caple additionally noted that Shakey's had not replied to his attorney's June 8, 1992 letter and requested that Shakey's inquire into this matter.

By letter dated September 22, 1992, Shakey's rejected Caple's request for additional time. Citing the need to insure preservation of the property, Shakey's stated that if repairs were not commenced within five days from the date of the request, Caple would be in default under the terms of the Lease Agreement. Shakey's did not address the November 1991 sublease or Donovan's letter of June 8, 1992.

On October 5, 1992, Donovan again wrote Shakey's and addressed *inter alia* the issue of repairs and the status of the November 1991 sublease. With respect to the issue of repairs, Donovan noted that the referenced repairs and/or replacements were commenced as requested and "will be completed promptly." With respect to the November 1991 sublease Donovan stated as follows:

> The next issue is the failure of Shakey's, Inc. to expressly approve in writing the sublease submitted by Buddy, Inc. to Shakey's in November of 1991. I wrote you on June 8, 1992 and informed you that Buddy, Inc. considers Shakey's to have approved the sublease. I never received a response or any contrary indication from you. Mr. Caple and Buddy, Inc. continue to labor under that assumption and have relied upon that assumption. If that assumption is incorrect, you should let me know immediately so that such detrimental reliance can cease. The subtenant, however, is entitled to written approval and Shakey's should submit such written approval immediately.

Shakey's never submitted its approval for the November 1991 sublease.

---

**3.** The problems referenced in the letter included cracks in the exterior masonry walls; a substandard roof system that should be corrected; water standing on the roof; improperly installed gas piping and sleepers to/beneath the HVAC units; debris on the roof; areas of the parking lot that require patching and/or replacement; flooring system that should be replaced; and electrical fixtures not operating properly.

In October 1992 Shakey's learned that Buddy, Inc. had been dissolved. In a letter dated December 21, 1992, the attorney for Shakey's, Jeffrey Germany, notified Caple that the Lease Agreement was being terminated effective January 31, 1993 pursuant to paragraph 19 of the Lease Agreement. Paragraph 19 provides:

> In the event of the insolvency or bankruptcy of the Lessee, or the filing of any petition under the bankruptcy statute, voluntarily or involuntarily and whether or not resulting in an adjudication in bankruptcy, or in the event of a partial or general assignment for the benefit of a creditor, at any time thereafter the Lessor shall have the right to terminate this lease upon giving written notice thirty (30) days in advance.

Germany stated that Shakey's "was shocked" to discover that Buddy, Inc. no longer exists, and that because of Buddy, Inc.'s dissolution, it is "presumptively insolvent under the terms of paragraph 19 of the Agreement." He went on to note that "Shakey's does not have, nor has it ever had, a relationship with James Caple, individually," and that Caple's name, while originally included in the Agreement, was stricken from the Agreement and initialed by Caple.

Caple, Brown, and Gaiser refused Shakey's demand for possession of the premises, and on March 31, 1993, Shakey's filed the lawsuit now before this Court. After this lawsuit was filed, Brown and Gaiser informed Caple that low sales and the uncertainty of the lease brought on by Shakey's lawsuit were forcing them to sell their restaurant business to Tran. In September 1993, some six months after this lawsuit was filed, defendants assigned the sublease to Tran without Shakey's consent.

## II.

Summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Evans v. Pugh,* 902 F.2d 689, 691 (8th Cir.1990). The burden on the moving party is only to demonstrate that the record does not disclose a genuine issue as to a material fact. Once that is done, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Rather, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Id.* (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted). The Court of Appeals for the Eighth Circuit has determined that a series of Supreme Court decisions

> demonstrates that we should be somewhat more hospitable to summary judgments than in the past. The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact.

*City of Mount Pleasant v. Associated Electric Cooperative, Inc.,* 838 F.2d 268, 273 (8th Cir.1988).

### A.

Defendants move for summary judgment on the following grounds: (1) Shakey's does not have a right to terminate the Lease Agreement as Caple, the sole shareholder of Buddy, Inc., succeeded to the assets of the corporation, including the Lease Agreement, as a matter of law; (2) Caple at all times treated the leasehold interest as an asset during and after dissolution of the corporation, at no point repudiated the Lease Agreement, and is entitled to succeed to the rights and obligations of that asset; and (3) the voluntary dissolution of Buddy, Inc. does not constitute a breach of the lease provision which permits Shakey's to terminate the Lease Agreement in the event of the insolvency or bankruptcy of Buddy, Inc. The Court agrees in all respects.

■ The general rule in this country is that a real estate lease to a corporation does not terminate upon the dissolution of the corporation unless the terms of the lease so provide or unless the lessee has intentionally abandoned the lease.

A lease to a corporation may, by its terms, terminate where the corporation ceases to exist. But unless the lease so provides, the rights and obligations thereunder are not extinguished by the corporation's dissolution, since leases affect property rights and survive the death of the parties. In other words, the dissolution of a corporation lessee before the expiration of the term does not constitute an automatic breach or termination in the absence of an express provision to that effect in the lease. Moreover, a dissolution does not give the lessor the right to regard it as an anticipatory breach of the contract. The stockholders succeed to the rights and liabilities of the dissolved corporation in an unexpired leasehold estate, including a corporate successor to the dissolved corporation which accepts the lease, and the obligation to pay rent, in accordance with the terms of the lease, may be enforced against its receiver.

16A Fletcher, *Cyclopedia of the Law of Private Corporations* § 8124 (Perm. ed., 1988 rev. vol. and Supp.1993). *See also Hutson v. Fulgham Industries, Inc.,* 869 F.2d 1457, 1461 (11th Cir.1989); *Middendorf v. Fuqua Industries, Inc.,* 623 F.2d 13, 16–17 (6th Cir. 1980); *Kelly v. Alstores Realty Corp.,* 250 N.J.Super. 11, 593 A.2d 347, 349 (A.D.1991), *aff'd,* 130 N.J. 313, 613 A.2d 1163 (1992); *Haddad v. Francis,* 40 Conn.Supp. 567, 537 A.2d 174, 177 (1986); *Jenot v. White Mountain Acceptance Corp.,* 124 N.H. 701, 474 A.2d 1382, 1385 (1984).

Shakey's does not contend the Lease Agreement contains a provision providing for the termination of the lease upon Buddy, Inc.'s dissolution but argues the legal effect of Caple's dissolution of Buddy, Inc. and assignment of the Lease Agreement to himself, as well as the November 1991 sublease and subsequent assignment to Tran,[4] was to repudiate the lease and breach express provisions of the Lease Agreement. The Court will address each of Shakey's arguments in turn.

1.

■ Shakey's first argues that Buddy, Inc.'s dissolution repudiated the Lease Agreement. Citing *South Main Akron, Inc. v. Lynn Realty, Inc.,* 106 N.E.2d 325 (Ohio App.1951), and *Kalkoff v. Nelson,* 60 Minn. 284, 62 N.W. 332 (1895), Shakey's argues that a voluntary dissolution of a lessee corporation and distribution of assets to the stockholders constitutes an anticipatory repudiation of a lease giving rise to an immediate cause of action. The Court does not find these cases to be helpful to Shakey's case. *South Main* involved a situation in which a dissolved corporation had assigned the lease to a shareholder who did not assume the obligations of the lease and who allegedly intended to abandon the lease after the expiration of a sublease. The court held that the appointment of a receiver for the purpose of preserving the rent then being paid by the sublessee to the original lessee, the dissolved corporation, was not premature and remanded for the taking of further evidence. 106 N.E.2d at 331. There was no attempt to terminate the sublessee's right to possession of the property. *Kalkoff,* a case cited in *South Main,* involved a situation in which the appointed receiver abandoned the lease as an asset of the corporation. 62 N.W. at 332–33. Neither *South Main* nor *Kalkoff* involved situations similar to the one before this Court in which the obligations of the lease have been fulfilled for some seven years following the dissolution of the corporate lessee and there is no showing of an intent to abandon or otherwise repudiate the lease.[5]

---

4. The February 1989 assignment of the Chung sublease to Brown and Gaiser was approved by Shakey's and does not present a disputed issue of material fact, notwithstanding Shakey's complaint that it was unaware of Buddy, Inc.'s dissolution when approval was given.

5. Shakey's also makes reference to *Okmulgee Window Glass Co. v. Frink,* 260 F. 159 (8th Cir.1918), *cert. denied,* 251 U.S. 563, 40 S.Ct. 342, 64 L.Ed. 415 (1920) (cited in *South Main* ), and *Rother–Gallagher v. Montana Power Co.,* 164 Mont. 522 P.2d 1226 (1974). Shakey's reliance on these cases is misplaced as both cases in-

Even were these cases on point, this Court will follow the general rule previously stated that a real estate lease to a corporation does not terminate upon the dissolution of the corporation unless the terms of the lease so provide.[6] While it may be true that the general rule is not to be applied blindly and that the dissolution of a corporate lessee may, in appropriate circumstances, constitute the anticipatory breach of a lease, *see Kelly v. Alstores Realty Corp.*, 593 A.2d at 351, this is not such a case.

### 2.

Shakey's next argues that Caple's dissolution of Buddy, Inc. and assignment of the lease to himself violated the express terms of the Lease Agreement restricting assignments. This argument is without merit since the effect of the dissolution of Buddy, Inc. was to transfer the leasehold by operation of law and not by assignment. A provision in a lease restricting assignments is not breached by a transfer effected by operation of law.

> It is universally held that a provision restraining the assignment of a lease includes only voluntary assignments, and is not operative against an assignment effected by law, or through an order of the court. So, an ordinary covenant against subletting and assignment is not broken by a transfer of the leased premises by operation of law.

*Lipsker v. Billings Boot Shop*, 129 Mont. 420, 288 P.2d 660, 666 (1955) (quoting 3 *Thompson on Real Property*, § 1431, p. 665). *See*

*also Buddon Realty Co. v. Wallace*, 238 Mo. App. 900, 189 S.W.2d 1002, 1008 (1945).

It is of no consequence that Caple assigned the lease to himself upon the dissolution of Buddy, Inc. Forfeiture, which is the right of a landlord to terminate a lease because of the lessee's breach of covenant or other wrongful act, is not favored in the law, *see Brazeal v. Bokelman*, 270 F.2d 943, 946 (8th Cir.1959); *Robinson v. Cline*, 255 Ark. 571, 501 S.W.2d 244, 246 (1973); *Meers v. Tommy's Men's Store, Inc.*, 230 Ark. 49, 320 S.W.2d 770, 772 (1959), and this Court will not find a forfeiture on the basis of an event which occurred by operation of law, regardless of any action Caple may have taken to affirmatively assign the lease to himself.[7] *Cf. Hutson v. Fulgham Industries, Inc.*, 869 F.2d at 1463 n. 15 (noting that a corporation need not assign corporate property during a wind-up period because the equitable rule, which provides that former shareholders of a dissolved corporation succeed in their individual capacities to certain assets of the corporation, operates to transfer such property into shareholders' hands upon the expiration of the wind-up period).

### 3.

Shakey's next argues the dissolution of Buddy, Inc. constitutes a breach of the lease provision which permits Shakey's to terminate the lease in the event of the insolvency of Buddy, Inc. This argument misunderstands the distinction between "dissolution" and "insolvency." As applied to corporations, insolvency is the "inability to pay

---

volved the effect of dissolution on existing *contracts* as distinct from *leases*. The typical lease, while having many contractual aspects, is a conveyance of an interest in real property. John E. Cribbet and Corwin W. Johnson, *Principles of the Law of Property*, Part 4, pg. 235 (3rd ed. 1989). It may be true that in some cases the dissolution of a corporation repudiates existing contracts, although the Court notes that the effect of dissolution on contracts is a question subject to much confusion and "the cause of considerable conflict in the decisions." 16A Fletcher, *supra*, § 8120. In any event, "the same confusion does not exist in cases of leases." Norman D. Lattin, *The Law of Corporations* § 183 (2nd ed. 1971). "Rights and liabilities under a lease survive dissolution unless there is a specific clause terminating the lease upon dissolution, whether voluntary or involuntary." *Id. Cf. Hutson v. Fulgham Indus-*

*tries, Inc.*, 869 F.2d at 1461 (noting that the classes of assets courts have held to devolve to shareholders upon dissolution are primarily interests in tangible real and personal property and corporate claims asserted within the wind-up period).

**6.** Fletcher indicates that *South Main* does not represent the prevailing view. 16A Fletcher, *supra*, § 8124.

**7.** Shakey's had already approved of the Chung sublease at the time of Buddy, Inc.'s dissolution and Caple took no action subsequent to the dissolution which could be construed as having harmed Shakey's. Thus, under the facts of this case, it is of no consequence that the dissolution of Buddy, Inc. was voluntary.

debts as they become mature in the usual course of business, either from available assets or from any honest use of credit." *Gilleylen v. Schoolfield,* 183 Ark. 143, 35 S.W.2d 356, 357 (1931). Dissolution is not the equivalent of insolvency.

'Dissolution' and 'liquidation' are terms of art. Dissolution is a means of doing away with the corporate entity. Liquidation refers generally to the conversion of all or part of the assets of a corporation into monetary assets. Neither is the equivalent of insolvency ...

*Vincel v. White Motor Corporation,* 521 F.2d 1113, 1121 (2nd Cir.1975).

Shakey's has not produced any evidence showing that the financial obligations required under the Lease Agreement were unfulfilled, and this Court finds that the dissolution of Buddy, Inc. did not breach the provision of the Lease Agreement which permits Shakey's to terminate the lease in the event of the insolvency of Buddy, Inc.

4.

■ Shakey's next contends that Caple did not "overtly" treat the lease as an asset following the dissolution of Buddy, Inc., but instead maintained—despite the 1986 assignment—that Buddy, Inc. continued to exist as a corporation for years after it had been dissolved. Although it is not clear, Shakey's appears to argue that a lessee's concealment of its identity forecloses a finding that a lease is treated as an asset, thus precluding a determination that Caple has succeeded to the rights and obligations of the lease. The Court rejects this argument.

■ Whether the stockholder has stepped into the shoes of the dissolved corporate lessee depends on whether the leasehold is treated as a valuable asset or abandoned. *Middendorf v. Fuqua Industries, Inc.,* 623 F.2d at 17. If the leasehold passes to the shareholders and is treated as a valuable asset, they become the principal obligees under the lease. *Id. See also* 16A Fletcher, *supra,* § 8124.

Here, there can be no question that the lease was treated as a valuable asset as Caple has performed the obligations required under the lease for the past seven years and has continued to locate tenants for the property. Shakey's cites no authority holding that a lessee's concealment of its identity forecloses a finding that a lease is treated as an asset, and the very fact of this litigation and the contentiousness with which it has been contested evidences that the lease is considered by all involved to be a valuable asset. *See Haddad v. Francis,* 537 A.2d at 178.

5.

■ Shakey's next argues the November 1991 sublease was not approved by Shakey's and violated the terms of the Lease Agreement restricting subletting. While it is true that Shakey's never expressly approved this sublease, the Court finds that Shakey's is estopped from asserting the November 1991 sublease as grounds for terminating the Lease Agreement.

■ Estoppel is an equitable doctrine which is invoked in appropriate circumstances to prevent a party from prevailing on purely technical grounds after having acted in a manner indicating that the opposing parties' strict compliance with the technicality would not be required. *INA/Cigna Ins. Co. v. Simpson,* 27 Ark.App. 222, 772 S.W.2d 353, 354 (1989); *Ferguson v. Unionmutual Stock Life Ins. Co. of America,* 501 F.Supp. 247, 250 (E.D.Ark.1980). The doctrine has been invoked in cases involving leases. *See Meers v. Tommy's Men's Store, Inc.,* 320 S.W.2d at 772 ("[a] lessor having, by his words and conduct, caused his lessees to believe that he would not enforce a forfeiture provided for in the lease is equitably estopped from seeking to avail himself of the forfeiture, although the consent was not given in writing as required by the lease") (quoting 3 *Thompson, Real Property* § 1472 (Perm.Ed.1940)); *Brazeal v. Bokelman,* 270 F.2d at 947 (a lessor, having a right of forfeiture may waive such right either expressly or by his conduct, and the right to forfeit may be lost by estoppel).

The record shows that Shakey's never acted on letters sent by Caple and his attorney in June, September, and October of 1992 seeking action on the November 1991 sublease, and that no act was taken by Shakey's

which would be indicative of an intent to enforce the forfeiture. Indeed, notwithstanding letters seeking approval of the sublease, Shakey's demanded in September 1992 that Caple make certain repairs to the property or be in default under the terms of the Lease Agreement.[8] This demand came some ten months after the November 1991 sublease and six months after Shakey's states it refused to approve the sublease because of Caple's failure to provide financial information. By not addressing the status of the sublease in September 1992 while at the same time stating the failure to make certain repairs would be considered a default under the terms of the Lease Agreement, Shakey's was indicating that it considered the Lease Agreement to be in full force and effect (notwithstanding its earlier refusal to approve the sublease) and that it at least tacitly approved of the November 1991 sublease. In this regard, Caple expended time, money, and effort in complying with Shakey's demand that the property be repaired with no notice from Shakey's that it intended to enforce the covenant restricting subletting. Under such circumstances, the Court has no hesitation in finding that Shakey's is estopped from asserting the November 1991 sublease as grounds for terminating the Lease Agreement. *Cf. Meers v. Tommy's Men's Store, Inc.*, 320 S.W.2d at 772 (lessor "stood silently by" and made no complaint while improvements were being made by lessee "and we think his complaint now comes too late").

### 6.

One final matter with regard to defendants' motion concerns Shakey's motion for leave to amend its complaint. Some six months after this lawsuit was filed defendants assigned the Brown and Gaiser sublease to Tran without Shakey's consent. Shakey's seeks to amend its complaint in order to add Tran as a defendant and assert the Tran assignment as grounds for terminating the Lease Agreement.

The Court has considered the circumstances surrounding the Tran assignment and concludes that Shakey's is estopped from asserting this assignment as a basis for terminating the lease. Shakey's induced the Tran assignment by filing a lawsuit lacking in merit and forcing defendants either to assign the sublease to Tran when Brown and Gaiser wanted out because of the uncertainty surrounding the sublease, or incur damages.[9] Forfeiture of a lease will not be found where the breach was induced by conduct of the lessor, *Meers v. Tommy's Men's Store, Inc.*, 320 S.W.2d at 772 (quoting 3 *Thompson, Real Property* § 1472 (Perm. Ed.1940)), and this Court finds that Shakey's is estopped from asserting the Tran assignment as grounds for terminating the Lease Agreement.[10] Accordingly, the Court denies Shakey's motion to amend the complaint.

### 7.

In sum, the Court finds there are no genuine issues of material fact with respect to defendants' motion for summary judgment and that defendants are entitled to judgment on Shakey's complaint as a matter of law. Because Shakey's is estopped from asserting the Tran assignment as grounds for terminating the Lease Agreement, the motion to amend the complaint is denied.[11]

---

**8.** The previous month, Shakey's had informed Caple that any resistance to their right to inspect the premises would be considered a default under the Lease Agreement.

**9.** Although the Court finds this is a meritless lawsuit, Caple's lack of candor regarding the dissolution of Buddy, Inc. precludes the imposition of sanctions pursuant to Fed.R.Civ.P. 11.

**10.** Paragraph 29 of the Lease Agreement provides that "[n]o waivers ... of this Lease or any agreements in connection therewith shall be valid unless in writing duly executed by both Lessor and Lessee herein." This paragraph could be construed as a "no waiver" provision (*i.e.*, that

the waiver of one breach of covenant shall not be construed as a waiver of future breaches). Such is of no consequence to this case, however, given the Court's finding that Shakey's is estopped from asserting the November 1991 sublease and the Tran assignment as grounds for terminating the Lease Agreement. The existence of a "no waiver" provision in a lease has no effect on an estoppel analysis. *See Entrepreneur, Ltd. v. Yasuna*, 498 A.2d 1151, 1163 (D.C.App.1985).

**11.** In granting defendants' motion for summary judgment, the Court notes that Shakey's has not been damaged by any of the actions of which it complains. Shakey's essentially claims it has been damaged in that had it known of Caple's

## B.

The Court next addresses Shakey's motion for summary judgment on Caple's counterclaim. In his counterclaim, Caple contends that Shakey's was aware that property values in west Little Rock substantially appreciated since 1977, and that the lease with Caple locked it into a rental rate less than current fair market value. Accordingly, argues Caple, Shakey's began in 1991 to engage in a course of conduct designed to extricate itself from the Lease Agreement culminating in this lawsuit in which it uses the fact of Buddy, Inc.'s dissolution as a pretext for terminating an unprofitable business relationship. Caple asserts the following claims: (1) breach of the implied covenant of good faith and fair dealing; (2) tortious interference with contract or prospective relations; (3) breach of contract; and (4) claim for punitive damages.

### 1.

Count I of the counterclaim is a claim for breach of the implied covenant of good faith and fair dealing. Caple asserts that Shakey's breached this covenant by (1) ignoring Caple's request that Shakey's approve or disapprove the November 1991 sublease so as to impede his ability to make the property income producing and meet his rental obligation; (2) demanding that a "laundry list" of repairs be made, refusing reasonable requests for extensions of time in which to make the repairs, demanding to inspect the premises, falsely accusing Caple of resisting Shakey's right of inspection under the Lease Agreement, and threatening to default the lease if the repairs were not commenced within five days; and (3) filing this lawsuit on the basis of Buddy, Inc.'s dissolution despite the fact that Shakey's received timely rental payments on checks drawn on Caple's personal account and dealt directly with Caple on all matters related to the Lease Agreement.

■■■ The Court rejects Caple's claim that Shakey's failure to approve the November 1991 sublease breached the covenant of good faith and fair dealing. Caple has not controverted Shakey's assertion that it did not approve the November 1991 sublease because of Caple's refusal to provide requested financial information. As previously noted, Caple admits he did not provide this information to Shakey's, stating "it wasn't any of their business." Although the Court has determined that Shakey's is estopped from asserting the November 1991 sublease as grounds for terminating the Lease Agreement, Caple, in his refusal to provide the requested financial information, provided Shakey's some justification for failing to specifically approve the sublease. The Court notes also that Caple has not shown how Shakey's failure to approve the sublease impeded his ability to make the property income producing and meet his rental obligation. Caple has at all times been able to locate tenants for the property and meet his rental obligations.

■■■ The Court also rejects Caple's claim that Shakey's assertion of its right to inspect the property and its September 1992 demand that the property be repaired breached the covenant of good faith and fair dealing. The Lease Agreement contains a provision granting Shakey's the right to inspect the premises, and paragraph 12 of the Agreement states that the lessee shall maintain the premises in good structural repair, shall make all structural repairs and replacements necessitated by any cause,[12] and shall make

---

1986 dissolution of Buddy, Inc. and concurrent assignment of the Lease Agreement to himself, it would have terminated the Lease Agreement at that time and realized gains from the increase in property values that have occurred since 1977. However, the Court has determined that neither the 1986 assignment, the November 1991 sublease, nor the Tran assignment provide Shakey's with grounds for terminating the Lease Agreement. The fact that the passage of time may have proven Caple's business acumen to be superior to that of Shakey's is not itself grounds for terminating the Lease Agreement. "[C]ourts will not lend themselves to striking down a contract,

otherwise valid, simply because the vicissitudes of time proved it to be a 'bad' bargain for one of the parties." *Brazeal v. Bokelman*, 270 F.2d at 949. *See also Kleinheider v. Phillips Pipe Line Co.*, 528 F.2d 837, 842 (8th Cir.1975).

12. Under the terms of the Lease Agreement, "structural" includes the framework, walls, roof and floor of all structures on the premises, driveways, parking areas, entrances, approaches, curbs, retaining walls, sidewalks, and the underground portion of the sewer, water, heating and electrical systems.

all other necessary non-structural repairs and replacements. This paragraph further provides that the lessee is obligated to commence making such repairs within five days after the lessor gives notice. Brown, Gaiser and Caple have each admitted in depositions that the repairs were necessary,[13] and the Court does not find that Shakey's breached the covenant of good faith and fair dealing in inspecting the property and enforcing the terms of the Lease Agreement as written and agreed to by Caple.

■ Finally, the Court rejects Caple's claim that because Shakey's received timely rental payments on checks drawn on his personal account and dealt directly with him on all matters related to the Lease Agreement, there was no basis for filing suit. Caple was not forthcoming with the fact of Buddy, Inc.'s dissolution and he was unwilling to provide updated financial information on the corporation. On that basis, Caple provided Shakey's with at least arguable grounds for filing a declaratory judgment action to determine its rights under the Lease Agreement.

### 2.

■ Count II of the counterclaim is a claim for tortious interference with contract or prospective relations. Caple argues he had a valid business relationship with Brown and Gaiser, and that Shakey's, knowing of that relationship, intentionally acted to interfere with the relationship and induce its breach. This claim is without merit.

■ Arkansas law recognizes that persons may sue for tort damages when their business has been tortiously interfered with by a third party. *Benny M. Estes & Assoc., Inc. v. Time Insurance Co.,* 980 F.2d 1228 (8th Cir.1992). The basic elements of tortious interference are (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage

to the party whose relationship or expectancy has been disrupted. *Nicholson v. Simmons First National Corp.,* 312 Ark. 291, 849 S.W.2d 483, 487 (1993).

The Court agrees with Shakey's that even assuming Caple can establish the first three elements of a tortious interference claim, he has not established any damages as a result of such interference. There is no evidence that the day-to-day operations of the restaurant were disrupted, and Caple has at all times located tenants for the property and made timely rental payments. Caple's claim that Shakey's has made his interest in the property unmarketable is conclusory and contradicted by the Tran assignment.

### 3.

■ Count III of the counterclaim is a claim for breach of contract. Caple premises this claim on paragraph 28 of the Lease Agreement, which provides that the terms, conditions, and covenants of the lease "shall be binding upon and shall inure to the benefit of each of the parties hereto, their heirs, personal representatives, successors, or assigns and shall run with the land." Caple argues he is the successor to Buddy, Inc., and that Shakey's actions in attempting to terminate the Lease Agreement in light of paragraph 28 constitutes a breach of the Lease Agreement.

While Caple is correct in asserting he is the successor to the Lease Agreement, the Court has determined that Caple's lack of candor with respect to Buddy, Inc.'s dissolution and his unwillingness to provide updated financial information on the corporation provided Shakey's with at least arguable grounds for filing this declaratory judgment action. That being so, the Court does not find that Shakey's attempt to terminate the Lease Agreement gives rise to a claim for breach of contract. Moreover, Caple has not demonstrated any damage from Shakey's attempt to terminate the Lease Agreement as he has at all times located tenants for the property and made timely rental payments, and this Court has affirmed that he is the lessee under the Lease Agreement.

---

**13.** Caple admitted there was nothing wrong in Shakey's requiring the repairs to be made; rather he objected to the manner in which the request was made.

4.

■ Count IV of the Counterclaim is a claim for punitive damages. Although punitive damages are recoverable in a tortious interference action, *see Benny M. Estes & Assoc., Inc. v. Time Insurance Co.*, 980 F.2d at 1233, the Court has determined that Shakey's is entitled to summary judgment on each of the three previous counts in Caple's counterclaim. Accordingly, Caple has no claim for punitive damages.

5.

In sum, the Court finds there are no genuine issues of material fact with respect to Caple's counterclaim and that Shakey's is entitled to summary judgment as a matter of law.

III.

For the foregoing reasons, the Court grants defendants' motion for summary judgment, grants Shakey's motion for summary judgment on Caple's counterclaim, and denies Shakey's motion to amend the complaint. There being no remaining issues, the Court hereby dismisses this lawsuit.

IT IS SO ORDERED.